[Civ. Nos. 24443, 24539. Second Dist., Div. One. Nov. 10, 1960.]

NICOLAS FERRARA et al., Appellants, v. SAM LA SALA et al., Respondents, and consolidated appeal.

Edmond Gattone for Appellants.

Aaronson & Shapero and Martin M. Shapero for Respondents.

LILLIE, J.—The present appeals were consolidated upon request of the parties. In No. 24443, plaintiff Nicolas Ferrara, a Los Angeles attorney, and his wife sought recovery of the unpaid balance on a promissory note for $6,776.77 (payable in $250 monthly installments) executed by defendants La Sala and Poole Truck Lines, a corporation, of which company the

La Salas and Ferrara were stockholders and officers; a second count against Poole Truck Lines only, was for sums assertedly due under a lease of certain realty owned by Mrs. Ferrara. The corporation defaulted. The answer of the La Salas admitted delivery of the note and payment of $1,250 thereunder but denied the complaint's allegations concerning defendants' execution of the note, their promise to pay and their default in payment. Various affirmative defenses were interposed; thus, in addition to the bare claim that the La Salas signed the instrument solely as representatives of the corporation, it was alleged that Ferrara and the La Salas came to an oral agreement whereby the former would sell them his stock and receive payment therefor out of available company funds only, that Ferrara would forego payment in the absence of such funds and retain the stock, and that pursuant to said oral agreement Ferrara "as the attorney for the named defendants herein" prepared the note in suit and submitted the instrument for signature; too, that Ferrara "as the attorney for the defendants" drafted the promissory note and "did fraudulently, willfully and deceitfully represent to the defendants" that it was prepared pursuant to the oral agreement of the parties and would carry such agreement into effect, and that the defendants believed Ferrara's representations, "as their attorney," that they were not incurring any personal liability in the premises. The business of the company did not prosper, and the present action was commenced. The trial court found in favor of the defendants La Sala; a motion for new trial having been denied, plaintiffs filed timely notice of appeal from the judgment.

Nine days after their notice of appeal from the judgment, plaintiffs filed in the trial court a "Notice of Motion and Motion to (1) Change and Correct Findings of Fact, (2) Change and Correct Findings of Fact in Conjunction with Denial of Motion for New Trial." Sought to be changed and corrected were certain findings declaring that Ferrara's oral representations were *fraudulently* and *deceitfully* made. Plaintiffs have appealed from the denial of such motion. (No. 24539).

As to the appeal from the judgment, the principal questions concern the sufficiency of the evidence to support the determination below that an attorney-client relationship existed at the time of and with relation to the particular transaction in suit by which an advantage was obtained, thereby bringing into operation the recognized rule, applicable to such a rela-

tionship and codified by section 2235 of the Civil Code,[1] that all such transactions and dealings are presumptively the result of undue influence by the attorney and voidable at the election of the client; also, whether the aforesaid rebuttable presumption was overcome by the quantum of evidence necessary to make it ineffectual under the circumstances at bar.

Whether an attorney-client relationship existed at the time the agreement was signed is a question of law (*De Long v. Miller*, 133 Cal.App.2d 175, 178 [283 P.2d 762]), but where there is a conflict in the evidence, the factual basis must be determined by the trial court whose province it is to evaluate the evidence (*Meehan v. Hopps*, 144 Cal.App.2d 284, 289 [301 P.2d 10]); it then becomes the province of this court to decide whether there is substantial evidence, including any reasonable inference deducible therefrom, to support the trial court's findings. There is evidence of the following salient facts:

Long before the controversy in question, Ferrara and Leonard La Sala became sufficiently acquainted to discuss going into business; thereafter they purchased and operated as partners a gasoline filling station, selling the business and dissolving the partnership; shortly thereafter, Ferrara and the La Salas, together with Harry Novak and Edward Poole, had their first discussion about organizing Poole Truck Lines. These discussions resulted in an oral understanding that the La Salas and Ferrara would each invest $6,000 in exchange for stock; Poole (already in the trucking business) agreed to transfer to the new corporation, in exchange for stock, his trucking permits and personal property, while Novak was to secure stock in return for his services. It was understood that Ferrara would act as the company's attorney and be compensated therefor on a monthly retainer; accordingly, he prepared articles of incorporation and subsequently obtained a permit to issue and sell stock. Meantime, and before any stock was issued, disagreements arose among the parties over Novak's right to any stock as well as Poole's further participation in the affairs of the company; Ferrara, at Sam La Sala's request, loaned Sam and Leonard $3,000 each to purchase Poole's right to stock. On November 1, 1956, stock certificates

---

[1] "All transactions between a trustee and his beneficiary during the existence of a trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence."

were issued to Ferrara and the La Salas: 66⅔ shares to Ferrara and 116⅔ shares each to Sam and Leonard. The company commenced operations with Sam as president; Leonard, vice-president and Ferrara, secretary. Ferrara testified that his role as an officer was an inactive one, although he was consulted occasionally and filed an answer on behalf of all concerned when Novak sued the corporation and the parties to this appeal. Some months later Ferrara discussed with the La Salas the sale and purchase of his stock; he told them that the corporation was actually their business, that he was not active in its management and was not being paid for his services. When the defendants agreed to Ferrara's suggestion, the latter prepared (and all parties signed) a memorandum in letter form which is set forth below:[2]

Balanced against the promissory note and the confirmatory agreement just mentioned was opposing testimony elicited from Leonard La Sala. ■■ Preliminarily, it is useless for plaintiffs at this state to invoke, as they do, the parol evidence rule and the principle respecting the finality of written instruments, since proof of Ferrara's oral representations (alleged in the various affirmative defenses) went in without

[2]"March 6, 1957

"Mr. Sam LaSala
Mr. Leonard T. LaSala
Poole Truck Lines, Inc.
1538 South Gerhart Avenue
Los Angeles 22, California

"Gentlemen:

"This confirms our agreement as follows:

"1. I will sell to Sam LaSala and Leonard T. LaSala my 66⅔ shares of stock of Poole Truck Lines, Inc., a California corporation. Title and possession of said shares, all rights to vote said shares, and all dividend rights of said shares, shall remain in me until the Promissory Note herein referred to has been paid in full.

"2. The purchase price for said shares of stock is $6,000.00, which sum Sam LaSala and Leonard T. LaSala shall pay to me.

"3. Poole Truck Lines, Inc. is indebted to me in the sum of $600.00 for retainer and services rendered at $100.00 a month for six months.

"4. Poole Truck Lines, Inc. is indebted to me in the sum of $176.77, balance due for incorporation fees and costs.

"5. The total of the above is $6,776.77, and is evidenced by the enclosed Promissory Note, which is payable at the agreed rate of $250.00 or more a month, principal and interest included, first payment due March 10, 1957.

"6. The enclosed Promissory Note does not include the $1,000.00 balance due of the $3,000.00 loan which I made to Sam LaSala and Leonard T. LaSala to acquire the shares of Edward R. Poole, and is in addition to the sum stipulated in said Promissory Note.

"7. The enclosed Promissory Note does not include Leonard T. LaSala's indebtedness to me in the sum of $468.10 for Federal and State income taxes which I paid for his and his wife's account, and is in addi-

objection and the admission of such testimony cannot now be challenged. (*Pao Ch'en Lee* v. *Gregoriou*, 50 Cal.2d 502, 506 [326 P.2d 135].) According to La Sala, he signed both the promissory note and the agreement prepared by Ferrara; his execution of the latter instrument, however, was explained as follows: ". . . he (Ferrara) said, 'Sign it.' I took it upon good faith. I know the man for a long time. That is how I signed it." A prior meeting with Ferrara regarding the whole transaction generally was thus described: "Well, on this paper here (the confirmatory agreement) that we were supposed to sign to buy his stock, we went up there. So he says, 'Well, get me off the hook. I want to get out.' I says, 'I ain't got no money.' He says, 'All right. Take it out of the corporation.' He says, 'We will make it very lean.' He says '$250,' so I turned around. I says, 'The corporation can't afford it either.' He says, 'Well, you can't squeeze blood out of a turnip, if you can't pay for it.'" Other testimony on La Sala's part, unnecessary to set forth, tended to support defendants' claim of their reliance on Ferrara's asserted representations that neither of them would be personally liable on the note. Ferrara, of course, denied the making of such representations. He admitted that he acted as attorney for the defendants "in other matters unrelated to this transaction"; asked whether he told them to seek other counsel, he said: "No. They wanted to buy the stock and I agreed to sell it to them." The record also reveals the following: "Q. By Mr. Shapero: Now, when Sam and Leonard La Sala signed the note for $6,776.77, did you tell them that they were taking on an obligation that was,

tion to the sum stipulated in said Promissory Note. Please sign the Promissory Note and one copy of this letter where provided for your respective signatures, and return to me in the envelope enclosed for that purpose. The copy of the Note and of this letter is for your records.

Very truly yours,<br>(Nicolas Ferrara)<br>Nicolas Ferrara

NF/rmt
"Confirmed, agreed to and accepted this March 7, 1957.

POOLE TRUCK LINES, INC.

| Sam LaSala | By Sam LaSala |
|---|---|
| Sam LaSala | Sam LaSala, President |
| Leonard T. LaSala | By Leonard T. LaSala |
| Leonard T. LaSala | Leonard T. LaSala, Vice-President |
| | By Nicolas Ferrara |
| | Nicolas Ferrara, Secretary" |

270

prior to that time, exclusively that of the corporation; for example the $776.77? A. I told them that when they executed the document they were obligating themselves to pay me $6,776.77. Q. Did you tell them that they were assuming an obligation which, prior to the execution of that instrument, they would not have been liable on? A. Well, I told them that the corporation owed me $776.77 (items 3 and 4 of the agreement), and they said, 'Yeh, that's true.' I says, 'I am going to add that to the note and make it one note for the sum of $6,776.77' and that would be the amount they would have to pay me." Questioned further about these same items 3 and 4 (attorneys' fees) and defendants' personal liability therefor, Ferrara replied: "A. Prior to the execution of the note? Q. Prior to the execution of the note? A. No, they were not. Q. What about after the execution of the note? A. Well, they were accommodation endorsers. Q. In other words, they assumed a liability which previous to that time had been exclusively a corporation obligation? A. (There was no audible response.) Q. I did not hear you, counsel. A. I didn't say anything. The agreement speaks for itself. This is the job of the Court."

■■ The burden of proving the existence of an attorney-client relationship rests upon the client (*Bradner* v. *Vasquez*, 43 Cal.2d 147, 151 [272 P.2d 11]; *Moore* v. *Hoar*, 27 Cal.App. 2d 269, 288 [81 P.2d 226]); the determination below that this burden was sustained is sufficiently supported by certain uncontradicted facts: Ferrara's professional dealings with the defendants had been of a continuous nature for at least six months prior to the present controversy; he was on a monthly retainer and had filed an answer for the defendants individually in the action brought by Novak; he admitted performing various other legal services for the La Salas, and the situation as to these other matters is not changed (as contended by Ferrara) simply because he was "not trying to make money off of them"—defendants were entitled to believe that they were under his care as a counselor employed by them and he was entitled to charge for his services if he so desired (*In re Soale*, 31 Cal.App. 144, 153 [159 P. 1065]); the transaction at bar was "a part of or intimately connected with the very business in reference to which the relation exists" (*Felton* v. *Le Breton*, 92 Cal. 457, 469 [28 P. 490])—in this instance, the business of Poole Truck Lines of which all parties were stockholders. Plaintiffs call attention to the rule that the rebuttable presumption (Civ. Code, § 2235) does not apply where the trans-

action is so *totally* unrelated to the attorney and client relationship that it cannot be presumed to have given the former any advantage. (7 C.J.S., Attorney and Client, § 127, pp. 967-968, citing *Stieglitz* v. *Settle,* 175 Cal. 131 [165 P. 436].) We have emphasized the critical word "totally" since each case must rest on its own particular facts; thus, in the Stieglitz case it appears that plaintiff-attorney was not the defendant's "general counsel," he "was not under retainer," defendant "had never consulted him at his office," and plaintiff "had never been to her house more than three times" (p. 132). Interestingly enough, decisions from other jurisdictions, relied on by plaintiffs, likewise make the previous continuous nature of the relationship, such as an annual or other retainer, one of several factors to be considered. (*Lindsay* v. *Marcus,* 137 Colo. 336 [325 P.2d 267] ; *Masters* v. *Elder,* 470 Ill. 512 [95 N.E.2d 360].) That approach to the problem, as already indicated, we approve and adopt.

 Before leaving this phase of the appeal, plaintiffs heretofore unsuccessfully sought leave to this court to produce additional evidence supportive of their claim as to the non-existence of a fiduciary relationship, which application is renewed in their brief. The record indicates that they were afforded such an opportunity upon the trial. Thus, after plaintiffs had rested their case following the first, and somewhat brief, session of court, permission was granted Ferrara "to offer some additional testimony"; thereafter he (Ferrara) testified at considerable length on matters not developed during his original appearance on the stand. Subsequently, the trial court denied still another application to bring in more testimony. No good reason appears why we should permit this action to be tried piecemeal, which would be the case if the application were granted.

 Once the relationship has been established, the burden of rebutting the presumption shifts to the attorney (*Denton* v. *Smith,* 101 Cal.App.2d 841, 845 [226 P.2d 723] ; *Roberts* v. *Wachter,* 104 Cal.App.2d 271, 278 [231 P.2d 534] ) ; it is a burden "which every attorney must bear when he seeks to enforce an agreement with his client which is to his advantage." (*Gold* v. *Velkov,* 133 Cal.App.2d 622, 628 [284 P.2d 890].) It is now definitely settled that the advantage gained by the attorney need not be an unfair advantage "before the presumptions of section 2235 are properly in the case." (*Bradner* v. *Vasquez, supra,* p. 151.) "When a fiduciary enters into a transaction with a beneficiary whereby

272

the fiduciary's position is improved, or he obtains a favorable opportunity, or where he otherwise gains, benefits, or profits, it may fairly be said that an advantage has been obtained." (*Bradner* v. *Vasquez, supra,* p. 152.) ▮▮▮ There was evidence from which the trial court could reasonably conclude that Ferrara obtained the advantage contemplated by the pronouncement just quoted. Thus, as a result of confidential information procured in his capacity as attorney, he learned that his participation in the Poole trucking enterprise was not going to prove profitable; the corporation being in financial difficulties, the confirmatory agreement was prepared to obtain additional security for the return of some or all of his original investment, as well as the payment of legal services rendered, by provisions therein making the defendants personally responsible for the items in question; tending to corroborate the foregoing is testimony that Ferrara asked one of the La Salas "to put up his house" in return for Ferrara's stock, which La Sala refused to do. The advantage to Ferrara is further demonstrated by his admitted failure to refer the defendants to other counsel for independent advice, which is also a circumstance the trial court properly took into consideration as indicative of undue influence or overreaching. (*Bradner* v. *Vasquez, supra,* p. 153.) Quoting him again, "The agreement speaks for itself. It is not my job to interpret this contract"; unfortunately for this attitude, however, the law is otherwise: "In the words of Lord Eldon, he must make it manifest that he gave to his client 'all that reasonable advice against himself that he would have given him against a third person.'" (*Felton* v. *Le Breton, supra,* 92 Cal. 457, 469 [28 P. 490].) In fairness to Ferrara, plaintiffs produced evidence that he was unaware of the company's approaching insolvency and that defendants' actions subsequent to the transaction indicated their knowledge of, and consent to, the provisions of the agreement respecting their personal liability for the corporation's obligations; the not unfamiliar picture is thus presented of conflicting evidence upon the issues in dispute which were determined adversely to plaintiffs by the trial court, whose finding is substantially supported and, therefore, conclusive on appeal.

▮▮▮ Remaining contentions are minor and subsidiary in character. First, it is urged that the defendants "did not specially plead the defense of Civil Code, section 2235, and they thereby waived it"; although the statute was not pleaded *in haec verba,* plaintiffs were certainly put on notice that the

existence of a fiduciary relationship was being claimed, no demurrer was interposed to the answer, and any pleading deficiencies (assuming they were present) were cured by evidence adduced upon the trial. (*Buxbom* v. *Smith*, 23 Cal.2d 535, 543 [145 P.2d 305].) Next, the disputable presumptions concerning the sufficiency of consideration for written instruments (Code Civ. Proc., § 1963) are said to overcome the presumption of insufficient consideration declared by section 2235 of the Civil Code. We need not discuss the effect of any apparent conflict or "battle" between these presumptions since the judgment may be sustained on the grounds already mentioned (*Bradner* v. *Vasquez, supra,* p. 154); parenthetically, however, *Donovan* v. *Security First National Bank,* 67 Cal. App.2d 845 [155 P.2d 856], relied on by plaintiffs, points out (citing several cases) that the presumption created by section 2235 does not overcome section 1963, *supra,* subdivision 21 (consideration for a promissory note) unless it is shown that the relationship was used by the trustee to obtain an advantage (p. 854), which is the situation at bar.

 Finally, the findings are attacked as being inconsistent and contradictory; if there is any merit in this argument (which does not call for reversal), it stems from the fact that some findings of the court were made by reference to paragraphs of the pleadings; "inaccuracies and conflicts are frequent when such method is adopted." (*Epstein* v. *Gradowitz,* 76 Cal.App. 29, 31 [243 P. 877].) Findings were made on the ultimate facts in this case; in reviewing the sufficiency of findings to support a judgment, the court will regard the ultimate facts found. (*Kaye* v. *Tellsen,* 129 Cal.App.2d 115, 119 [276 P.2d 611].) The findings at bar cannot be held prejudicially erroneous.

 We now take up the matters embraced by No. 24539. The judgment in the main action was entered on July 6, 1959; on July 15, 1959, plaintiffs filed notice of motion for a new trial, the grounds of the motion being insufficiency of the evidence and errors of law committed by the court; the motion was denied on August 21, 1959, and plaintiffs on September 15, 1959, appealed from the judgment. Nine days later plaintiffs moved the court to change and correct certain findings of fact under powers assertedly given by section 662, Code of Civil Procedure,[3] and upon the grounds of plaintiffs' mistake,

---

[3] "In ruling on such a motion, in a cause tried without a jury, the court may, on such terms as may be just, change or add to the findings,

274

inadvertence and excusable neglect, and inadvertence and mistake of the court in signing such findings. ▮▮▮ It may be seriously doubted whether the court would entertain such motion under section 662 since it had already acted on a prior motion for new trial (albeit on different grounds) and any such order regularly made is conclusive so far as the court making it is concerned (*Drinkhouse* v. *Van Ness*, 202 Cal. 359, 369 [260 P. 869]); however, if relief under section 473, Code of Civil Procedure, is sought—and that appears to be an additional basis of the motion—the court is authorized to correct clerical, but not judicial, errors, in order that its records may correspond to the actual facts (*Sampson* v. *Sapoznik*, 124 Cal.App.2d 709, 712 [269 P.2d 209]; *Francis* v. *Riddle*, 15 Cal.App.2d 291, 292-293 [59 P.2d 536]); and this, notwithstanding the pendency of an appeal. (*Halpern* v. *Superior Court*, 190 Cal. 384, 387 [212 P. 916].)

▮▮▮▮ From the affidavit of Ferrara in support of the motion, it appears that on July 13, 1959, two days before the filing of plaintiffs' motion for new trial, he and opposing counsel met in chambers with Judge Wolfson (the trial judge) at which time a discussion was had regarding the findings of fraud and deceit; Judge Wolfson, it is averred, said he would strike such findings ''and find instead that there was no fraud and deceit, and would correct the findings accordingly''; further, ''Judge Wolfson told affiant that he would correct the findings, but for affiant to go ahead and file said motion (for new trial) and protect himself.'' Following the denial of the motion, and no action having been taken with respect to correcting the findings, affiant sought out Judge Wolfson who, it is then averred, stated that his failure to correct the findings had been due to an ''oversight'' and affiant was invited to ''prepare an Order correcting the Findings''; subsequently Judge Wolfson failed to sign the order thereafter prepared, stating to affiant ''that he did not know whether he had the authority'' to do so. Plaintiffs then filed their motion to obtain the relief therein set forth (and previously described); although no counteraffidavit was filed or opposing testimony

modify the judgment, in whole or in part, vacate the judgment, in whole or in part, and grant a new trial on all or part of the issues, or, in lieu of granting a new trial, may vacate and set aside the findings and judgment and reopen the case for further proceedings and the introduction of additional evidence with the same effect as if the case had been reopened after the submission thereof and before findings had been filed or judgment rendered. Any judgment thereafter entered shall be subject to the provisions of sections 657 and 659 of this code.''

taken, the trial court took the view that the error, if any, was judicial and not clerical, and denied the motion.

The question is whether the court in signing the challenged findings acted inadvertently rather than in the exercise of a judicial discretion. "It is primarily for the trial judge to determine whether a decision misstated his real intention and whether the judgment as signed was an inadvertence" (*Minardi* v. *Collopy*, 49 Cal.2d 348, 352 [316 P.2d 952]), and his conclusion as to that question will not be lightly brushed aside. (*Bastajian* v. *Brown*, 19 Cal.2d 209, 214 [120 P.2d 9].) Upon the hearing on the instant motion, Judge Wolfson stated: "I will say for your benefit, I don't think that in this case, in all your actions with the defendants, there was any intention on your part to deal with them fraudulently. I am satisfied in my own mind that 2235 makes it necessary. Mr. Ferrara: 2235 of the Civil Code, you mean? The Court: Of the Civil Code. I won't say 'makes it necessary,' but the language in the cases seem to use the words 'fraud' and 'undue influence' interchangeably. Maybe if I had to decide this case all over again, I would decide it the same way, but I might have stated in my findings the language of 2235, that is, there was no consideration and then in a conjunctive. The statute says 'and' undue influence. It is my opinion that undue influence is an element of fraud. I believe that covers the position I tried to explain to you before."

The findings in question declared as "true" certain allegations in the answer that Ferrara "fraudulently and deceitfully" misrepresented certain matters to his asserted clients. From the remarks just quoted, the court clearly adhered to the view that his ultimate finding that the presumption of section 2235 prevailed was tantamount to finding that some form of fraud was inherent in the transaction. True, the word "fraud" as such is not found in the pertinent statute; the following cases, however, declare that where the fiduciary relationship exists, a rebuttable presumption "of fraud or undue influence" arises: *McDonald* v. *Hewlett*, 102 Cal.App.2d 680, 687 [228 P.2d 83, 24 A.L.R. 2d 1281]; *Estate of Phillipi*, 76 Cal.App.2d 100, 102 [172 P.2d 377]; *Bohn* v. *Gruver*, 111 Cal.App. 386, 394 [295 P. 891] "fraudulent or secured by undue influence"; *Estate of Witt*, 198 Cal. 407, 419 [245 P. 197] "fraud and unfair dealing." In Witkin, California Procedure, Attorneys, section 6, it is said that "the advantage over his client is *presumed* to be obtained by *undue influence* or *constructive fraud.*" The situation seems somewhat

analogous to that in *Bradner* v. *Vasquez, supra,* where the court conceded that ''there was no direct evidence of *intentional* undue influence (emphasis added). However, the presumption of undue influence is evidence and it is sufficient to sustain the judgment although there may be direct evidence contrary to the presumption.'' (P. 153.) Without deciding that the findings necessarily required the use of the words ''fraudulently'' and ''deceitfully'' in order to sustain the finding as to the ultimate facts, we cannot lightly brush aside the trial court's conclusion that his actions were no mere inadvertence but the result of judicial discretion by him exercised. The contentions made by plaintiffs in No. 24539 are not sustainable.

The judgment (No. 24443) and order (No. 24539) are affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied December 7, 1960, and appellants' petition for a hearing by the Supreme Court was denied January 4, 1961. Peters, J., and Dooling, J., were of the opinion that the petition should be granted.