[Civ. No. 29247. Second Dist., Div. Four. Dec. 16, 1966.]

JACK GOLD, Plaintiff and Appellant, v. ROSE GREENWALD, Defendant and Respondent.

298

Gloria Shimer, White, Oberhansley & Fleming, Carver & Paul, Edgar R. Carver, Jr., Jack G. Magnus, Swerdlow, Glikbarg and Shimer and William D. Moore for Plaintiff and Appellant.

Loeb & Loeb and Howard I. Friedman for Defendant and Respondent.

FOX, J.*—Plaintiff brought this action for a termination of an oral joint venture agreement and for an accounting of the profits therefrom. He has appealed from a judgment in favor of the defendant.

The decision of the trial court was to the effect that, though an oral joint venture agreement containing the terms contended for by plaintiff was entered into between the parties, said agreement was unenforceable against defendant under the provisions of section 2235 of the Civil Code[1] by reason of the failure of plaintiff to establish that said joint venture agreement was entered into without undue influence, with a full disclosure of all of the facts to the defendant and for a fair and adequate consideration.

### SUMMARY OF FACTS[2]

1. Plaintiff has been engaged in the practice of law in California since 1948 and since 1957 has been a member of the law firm of Gold and Gold. He is also a certified public accountant. The court found ''Plaintiff is an experienced business, commercial and tax lawyer.''

2. Commencing in 1953 plaintiff became the attorney for defendant and continued as such, either individually or as a member of Gold and Gold until approximately November 21, 1961. He was the attorney for defendant throughout the transaction which is the subject of this action. Defendant relied upon him as her legal adviser and reposed trust and confidence in him. In the course of such representation and prior to June 1960, strong bonds of friendship developed between plaintiff and defendant and each held the other in high esteem.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1] At the time of the transaction here involved, section 2235 of the Civil Code read:

''All transactions between a trustee and his beneficiary during the existence of the trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence.''

In 1963 this section was amended by adding the following sentence: ''The presumptions established by this section do not apply to the provisions of an agreement between a trustee and his beneficiary relating to the hiring or compensation of the trustee.'' (Stats. 1963, ch. 1215, p. 2733, § 1.)

[2] The reporter's transcript covers 2,060 pages.

3. Defendant is an experienced, capable and successful businesswoman, with substantial experience in real estate investments. She has had no legal training.

4. During the controversy involved in this litigation, defendant was not represented by any attorney other than plaintiff. At no time throughout this period did plaintiff suggest to defendant that she consult independent counsel or obtain independent legal advice in connection with the transaction which is the subject of this action. She did not, in fact, consult other counsel or seek independent legal advice concerning this transaction.

5. Except for the transaction here involved, plaintiff and defendant had only one other transaction in which they had a joint interest. This was in 1956 when plaintiff, defendant and one Ray Ryan, also a client of plaintiff, acquired certain unimproved property located in the Palm Springs area, called "Mountain View Estates No. 2." In that transaction each of the parties contributed proportionate sums for the purchase thereof and for its operating expenses during the time that said property was owned by the parties. The title to the property was held in the name of defendant alone. In June 1960 the property was sold and the profits were distributed to plaintiff, defendant and Ryan in accordance with their respective interests. Such legal services as were required in connection with this transaction were rendered by plaintiff. There was no written agreement between the parties covering the Mountain View Estates deal.

6. In 1960 defendant came to the conclusion that the acquisition of real estate on Wilshire Boulevard in Los Angeles represented an attractive appreciation investment opportunity. She particularly became interested in acquiring certain property known as "Wilshire Tower." She believed this property could be purchased for substantially less than its actual value, taking into account its long range potential. As a consequence, defendant acquired title to this property in her own name later that year for a purchase price of $1,200,000.

7. "In June of 1960, an oral agreement was entered into between plaintiff and defendant, whereunder it was agreed that a joint venture would be formed between plaintiff and defendant in connection with Wilshire Tower, and that plaintiff and defendant would each have a one half interest in said joint venture. Plaintiff was to contribute legal services and defendant was to contribute managerial and other services and was to provide all of the financing and other funds required

for the acquisition and operation of the property. No other terms of the joint venture agreement were discussed or agreed upon.'' (Finding VI.)

8. Twenty five thousand dollars of the purchase price for the acquisition of Wilshire Tower was paid to the sellers outside of escrow. Twelve thousand five hundred dollars of this sum was contributed by defendant and $12,500 was contributed by plaintiff at the request of defendant. On or about July 8, 1960, an escrow was opened for the purchase of said property for $1,200,000. The escrow was in the name of the defendant alone as purchaser and was to close on or about Decmbr 31, 1960.

9. Upon the opening of the escrow, defendant commenced to search for permanent financing and negotiated actively with various brokers and financial institutions. She believed that a loan of $1,000,000 or more could be obtained on the property from union sources, thereby making the amount of cash they would be required to put up relatively small. By the end of the summer of 1960, it became apparent that the favorable financing which defendant anticipated securing from union sources was not available. She then met with plaintiff and explained to him that she believed she could secure financing in the approximate amount of $900,000 which would require each of them to provide an additional $150,000 to close the escrow. As a result of their discussions, defendant believed that plaintiff would provide one-half of whatever sums were required.

10. A few days prior to the scheduled closing of the escrow, defendant was about to secure interim financing from a local bank in the amount of $1,100,000, less a loan fee of $22,000 retained by the bank. This loan was for an interim period only and was supported by a take-out commitment from a savings and loan association with terms which both plaintiff and defendant considered unsatisfactory for permanent financing. Thus, plaintiff and defendant recognized that other sources of permanent financing would still have to be sought and obtained after the acquisition of the property. In order to close the escrow, various costs and expenses were incurred. Loan fees of $46,000 and various expenses of appraisals, entertainment and other miscellaneous costs were all paid by defendant. In addition, defendant supplied $109,000 required as a part of the purchase price in order to close the escrow. Plaintiff contributed none of said funds. One hundred fifty thousand dollars of the money used to close the transaction was money loaned

by other clients of plaintiff, the Steins, who loaned the mony at plaintiff's request after being told that plaintiff had a one-half interest in the transaction. As evidence of the loan the Steins received a promissory note signed only by defendant and secured by a first deed of trust on defendant's unimproved property in Palm Springs having a value in excess of $350,000. Plaintiff's name does not appear on said documents as an obligor. Defendant had expected plaintiff to provide one-half of the funds required to close the escrow and was disappointed in plaintiff when he failed to do so.

11. In connection with the oral agreement which the trial court found to have been made between the parties (see par. 7, *supra*), there was no discussion of who would bear the losses, if any, nor regarding the rights and duties of the parties in connection with incurring obligations in the operation of the venture. There was no discussion of the term of the venture, nor any discussion of the system of accounting to be maintained in connection with its operation. Likewise, there was no discussion relative to the transfer of partnership interests nor of the effect of the death of either of the parties on the venture.

12. Shortly after the acquisition of Wilshire Tower and due to the extreme difficulties of obtaining favorable long term financing, defendant put the property on the market, notwithstanding the fact that the purpose of acquiring the property had been originally that of a long term appreciation.

13. Income from the property was not sufficient to defray costs of operation. In April of 1961 approximately $20,000 was required for real property taxes. Defendant informed plaintiff that she would not continue to put money into the project unless the money was matched by him. Plaintiff initially refused to put up any money for the real estate taxes. However, he finally agreed to put up one-half of the real estate taxes provided he could obtain certain federal income tax advantages for the year 1960 by taking one-half of the loss on the Wilshire Tower incurred in that year as a consequence of the payment of loan fees by defendant. Accordingly, at plaintiff's suggestion defendant executed an instrument in which plaintiff was authorized to take one-half of the losses of the venture for tax purposes, although he had not contributed any of the funds reflected in this operating loss (see Plaintiff's Exh. 21). As a result of this arrangement, plaintiff reduced his income tax for 1960 by an amount sufficient to enable him to make his contribution of $10,000 for the real estate taxes on Wilshire

Tower. Thereafter, in June of 1961 plaintiff and defendant each contributed an additional $750 for the purpose of meeting current interest payments.

14. All legal services in connection with the purchase and sale of Wilshire Tower and in its operation were rendered by the firm of Gold and Gold. During the time the property was held by defendant, she devoted substantially all of her working time to said property. The offices of Gold and Gold devoted approximately 400 hours of attorney's time to the Wilshire Tower venture. As the interim loan was about to become due, defendant took the property off the market. She did this because she felt she would have to secure other financing and that it would be easier to secure such financing if the property was not on the market for sale. Defendant had discussions with plaintiff concerning what was to be done with the property as the bank loan would soon become due. Plaintiff stated to defendant that he was out of the deal and that she would have to get refinancing herself. As the result of their conversations, defendant came to the conclusion that plaintiff was unwilling to come up with additional money that would be required to pay the bank loan or to pay the balance of the bank loan after new financing was obtained. She thereupon began a search for new financing. While engaged in such negotiations, an offer to purchase was made by a third party and the property was sold in a very short time for $1,381,250 from which a net profit of $70,128 was realized. The sale was consummated in November 1961 just prior to the maturity of the bank loan.

15. After the acquisition of Wilshire Tower early in 1961, plaintiff and defendant took over the operation and management of the property. The law offices of Gold and Gold were used for such purpose and defendant had the use of secretarial help in the office. Arrangements were made for the tenants to mail their rent checks to Gold's office; a bookkeeper was hired who did his work there; Gold wrote up new leases negotiated by defendant; there were problems involving insurance, parking lot arrangements, garbage hauling, utilities, and employees of Wilshire Tower which had to be resolved. Most tenant complaints were handled by defendant from time to time. Gold dealt with representatives of major tenants, Desmonds and Silverwoods.

16. The court found that plaintiff "did not render to defendant the independent advice concerning her legal rights against himself of the character and to the extent that he would have rendered such advice to defendant had she been

engaged in a venture with a third person." Plaintiff did not recommend to defendant that she consult independent counsel in connection with this joint venture agreement, and she did not consult any other attorney with reference to the Wilshire Tower deal with plaintiff. But, "Throughout the transaction of Wilshire Tower, defendant considered plaintiff to be her lawyer, and not just the lawyer for the joint venture."

17. The court also found:

"Plaintiff failed to make a full disclosure to defendant of the legal consequences, and the liabilities and rights of the parties that were contained in the joint venture agreement. Said joint venture agreement was entirely oral, and no writing exists concerning the agreement, other than plaintiff's Exhibit 21. Other than the terms referred to in Finding of Fact VI herein [see our paragraph 7, *supra*], there was no discussion whatever of other terms of said joint venture agreement."

18. The court further found:

"There was no intentional undue influence exerted by plaintiff upon defendant in connection with the making and entering into of the joint venture agreement. Such undue influence exists only insofar as the carelessness and failure of plaintiff in making a full disclosure to defendant of her legal rights and obligations and in failing to render to her legal advice as her attorney amounts to undue influence.

"The exposure of defendant was much greater in the transaction than the exposure of plaintiff. Notwithstanding that fact, the joint venture agreement was, under all of the circumstances, a fair one, if it had been entered into by defendant with full knowledge of her responsibilities and liabilities. If one can enter into a contract for a fair and adequate consideration between a lawyer and a client without such knowledge, the joint venture agreement referred to in paragraph VI hereof [our paragraph 7, *supra*] was a fair agreement. To the extent that one cannot have fair and adequate consideration in the absence of such knowledge, there was no adequate consideration to defendant in the joint venture agreement."

19. Upon the sale of Wilshire Tower in November of 1961, the sum of $23,250, contributed to the venture by plaintiff, was returned to him by defendant.

20. The crucial conclusions of law are:

"I

"The presumptions of Section 2235 of the Civil Code apply to the joint venture agreement between plaintiff and defendant.

## "II

"An agreement entered into between an attorney and a client is without sufficient consideration and is deemed to have been made through undue influence where the attorney has failed to advise the client fully, both as to her rights and as to her liabilities, at the time the transaction is entered into, and has failed to render the legal advice to the client, which under similar circumstances a disinterested legal adviser would have rendered.

## "III

"Plaintiff has not demonstrated clearly, convincingly and satisfactorily that the oral joint venture agreement was entered into without undue influence, with a full disclosure of all of the facts to the defendant and for a fair and adequate consideration."

█ There can be no doubt as to the correctness of the first conclusion of law. Thus, the presumptions declared in section 2235, viz, that the agreement was entered into by the defendant without an adequate consideration and as a result of undue influence, were immediately activated. The burden was thereupon cast upon plaintiff to rebut these presumptions. The trial court, however, concluded that plaintiff had not demonstrated that the oral joint venture was entered into "without undue influence, with a full disclosure of all the facts to defendant and for a fair and adequate consideration." █ The basis for this principle derives from the declaration of Lord Eldon in *Gibson* v. *Jeyes*, 6 Ves. 728, that, in a business transaction between an attorney and his client, the attorney must give to his client "all that reasonable advice against himself that he would have given him against a third person." This principle has been a part of California jurisprudence for the past 75 years, having been quoted by our Supreme Court with approval in *Felton* v. *Le Breton*, 92 Cal. 457, 469 [28 P. 490], in the following context: "While an attorney is not prohibited from having business transactions with his client, yet, inasmuch as the relation of attorney and client is one wherein the attorney is apt to have very great influence over the client, especially in transactions which are a part of or intimately connected with the very business in reference to which the relation exists, such transactions are always scrutinized by courts with jealous care, and are set aside at the mere instance of the client, unless the attorney can show by extrinsic evidence that his client acted with full knowledge of all of the facts connected with such transaction, and fully understood

their effect; and in any attempt by the attorney to enforce an agreement on the part of the client growing out of such transaction, the burden of proof is always upon the attorney to show that the dealing was fair and just, and that the client was fully advised. . . . In the words of Lord Eldon, he must make it manifest that he gave to his client 'all that reasonable advice against himself that he would have given him against a third person.' ''

This principle finds further expression in *Estate of Witt,* 198 Cal. 407, 419 [245 P. 197], where the court stated: ''All dealings between an attorney and his client for the benefit of the former are not only closely scrutinized, but are presumptively invalid on the ground of constructive fraud and such presumption can be overcome only by the clearest and most satisfactory evidence. Not only must the attorney offer clear and satisfactory evidence that the transaction between himself and his client was fair and equitable and no advantage was taken by him, but he must also offer proof that the client was fully informed of all matters relative to the transaction and was so placed as to be able to act understandingly and to deal with the attorney at arm's-length.''

This principle has been repeatedly reiterated in later cases (*Estate of Phillipi,* 76 Cal.App.2d 100, 102 [172 P.2d 377]; *Estate of Johnson,* 85 Cal.App.2d 760, 761 [193 P.2d 782]; *Gold* v. *Velkov,* 133 Cal.App.2d 622, 628-629 [284 P.2d 890]; *Ferrara* v. *La Sala,* 186 Cal.App.2d 263, 272 [9 Cal.Rptr. 179].) ■ As stated in *Bonifacio* v. *Stuart,* 52 Cal.App. 487, 489 [199 P. 69], the attorney must show that the client ''was fully advised both as to his rights and as to his liabilities at the time'' he entered into the transaction. It is axiomatic in this context that the attorney must show that the client was fully informed of all matters relating to the transaction including his rights and obligations growing out of it. ■ Absence of independent legal advice is a circumstance that the trial court may consider on the question of undue influence. (*Bradner* v. *Vasquez,* 43 Cal.2d 147, 153 [272 P.2d 11].)

■ Applying these principles to the factual picture at hand, it is apparent that there is ample support for the trial court's conclusion that plaintiff had not demonstrated that the oral joint venture agreement was entered into ''without undue influence, with a full disclosure of all the facts to the defendant and for a fair and adequate consideration.''

It will be recalled that the court found: ''Plaintiff failed to make a full disclosure to the defendant of the legal conse-

quences, and the liabilities and rights of the parties that were contained in the joint venture agreement.'' And in connection with the Wilshire Tower, the court found that: ''. . . plaintiff and defendant would each have a one half interest in said joint venture. Plaintiff was to contribute legal services and defendant was to contribute managerial and other services and was to provide all of the financing and other funds required for the acquisition and operation of the property. *No other terms of the joint venture agreement were discussed or agreed upon.*'' (Italics added.) This failure of plaintiff to make a full disclosure to defendant of the legal consequences and the liabilities and rights of the parties under the agreement was a clear failure on his part to meet the responsibility that was placed upon him under section 2235 of the Civil Code in view of the relationship of the trust and confidence that existed between him and his client. True, the court found that the client was experienced in real estate investments, but it also found that she had no legal training. Her success in real estate investments was no doubt in substantial measure attributable to her understanding of finances, her ability to discover properties that had a potential appreciation in value, her understanding of management techniques in handling business properties and her trading ability. She recognized that she needed someone skilled in the law to handle the various legal problems that were likely to arise in connection with a property such as here involved. But in going into such a transaction, she was entitled to advice with respect to the legal consequences and liabilities of such a transaction and also what her rights would be. She was also entitled to advice on various aspects of the joint venture, such as, for example, the right of one of the parties to transfer his or her interest and what would happen in the event one or the other of the parties should pass away. Furthermore, she was entitled to have her relationship with plaintiff spelled out in a written document so that they might each the better understand his own rights, duties and obligations and thus avoid arguments which they had from time to time during the course of this transaction and which finally have resulted in this lawsuit. Defendant was entitled to expect that plaintiff would provide her with the same type of legal advice and guidance in this transaction that he would have provided her if she were in this joint venture with a third party. This she failed to get and thus plaintiff violated the injunction of Lord Eldon—that he must give his client all that reasonable advice against himself that he would

have given her against a third person. The trial court also was entitled to take into account the fact that he did not suggest to her that she seek independent legal advice from some other attorney with respect to this joint venture and that she did not on her own account seek or receive independent legal advice with respect to it.

These facts and circumstances and the inferences that reasonably may be drawn therefrom furnish ample support for the trial court's conclusion and judgment in this case. Plaintiff argues that, since defendant was experienced in real estate transactions, and since there was no intentional undue influence practiced by him on defendant, and since the deal was otherwise fair, the mere fact that at the time such agreement was made the attorney did not discuss with his client all her legal rights and obligations as a joint venturer is not enough to sustain conclusions of undue influence and inadequate consideration. This argument is not persuasive for two reasons:

1. The foundation for the court's conclusions is much broader than the premise which plaintiff suggests. It will be recalled that the findings state: "Plaintiff failed to make a full disclosure to defendant of the legal consequences, and the liabilities and rights of the parties that were contained in the joint venture agreement." The agreement, entirely oral, was that defendant would provide the financing for the project and contribute managerial and other services, while plaintiff would provide the legal services, and they would each own a one-half interest in the venture. Beyond this "there was no discussion whatever of other terms of said joint venture agreement." From this it does not appear that at the time the joint venture agreement was entered into plaintiff advised defendant at all concerning the legal consequences of the agreement or her rights and liabilities under it. It does appear, however, that he did not make "a full disclosure" of these matters. Furthermore, it is quite obvious that plaintiff did not provide defendant with the advice against himself which he would have given her if she had been dealing with a third person. He failed to explore with her important aspects of the law relating to joint ventures and what would happen to funds that she might advance in the event she was unable to close the escrow, or having acquired the property was unable to secure long term financing and was unable to make a profitable sale or trade. He also neglected to suggest that she consult independent counsel.

2. To hold that the facts in this case are not sufficient to sustain conclusions of undue influence and inadequate con-

sideration would be to dilute the responsibility which an attorney owes to a client in a business venture. It, of course, may be said that the law as announced by the cases cited herein exacts a very high standard for a lawyer who enters into a business venture with his client, but that is as it should be. Ordinarily the relation of attorney and client is such that the attorney is likely to have very great influence over the client. This is particularly true where the transactions are a part of or intimately connected with the very business in reference to which the relationship exists. In enacting section 2235 of the Civil Code the Legislature has seen fit to place a high standard on the conduct of attorneys when dealing with their clients in business matters. The courts have consistently adhered to this philosophy in interpreting the statute and applying it to the various situations that have come before them.

Plaintiff argues that, since the court found that the joint venture agreement was, under all circumstances, a fair one the issue of undue influence drops out of the case.

Plaintiff has misread the finding. The court found that the agreement was ''a fair one if it had been entered into by defendant with full knowledge of her responsibilities and liabilities.''

This is a purely hypothetical finding, assuming facts contrary to those found elsewhere in the court's decision. Part of the consideration for the plaintiff's share was his legal services, but the court found that defendant did not receive the kind of legal advice and protection which plaintiff was bound to provide.

The transaction was a speculation, involving a variety of risks. The consideration for incurring such risks can hardly be called ''fair'' where the defendant did not receive all of the advice and protection to which she was entitled as a part of her bargain.

The findings indicate that the client entered into an oral arrangement which was uncertain and incomplete, exposing her to heavy financial risks, and posing serious potential legal problems for which no preparation had been made and against which she had not been warned or advised. It is entirely immaterial that the consideration would have been legally sufficient to support a contract with a person who was dealing at arm's length, or a person who had had full and proper warning and advice.

Plaintiff argues that defendant suffered no injury in this transaction, therefore she is not entitled to any relief. He overlooks the position of defendant in this action. Defendant

does not seek to recover damages; she seeks to rescind her contract and to disaffirm it because plaintiff violated the fiduciary duty he owed her.

Plaintiff's argument is based upon *Kisling* v. *Shaw,* 33 Cal. 425 [91 Am.Dec. 644], and *Barnes* v. *Dobbins,* 159 Cal.App.2d 737 [324 P.2d 696]. *Kisling* was a suit by a client to set aside deeds in the name of the defendant, his attorney. The judgment of the trial court was for the defendant, and this was affirmed on appeal. After the court defined the rule applicable to contracts between attorney and client, it then went on to hold that the client must first show that he has been injured by the transaction before the burden shifts to the attorney. (33 Cal. at 433.) *Kisling* was decided in 1867 which was prior to the enactment of section 2235 of the Civil Code which was adopted in 1872.

The presumptions declared in section 2235 are activated upon the making of a contract that comes within that section by which the attorney obtains "any advantage"—it "need not be an unfair advantage." (*Ferrara* v. *La Sala,* 186 Cal.App.2d 263, 271 [9 Cal.Rptr. 179] ; *Bradner* v. *Vasquez,* 43 Cal.2d 147, 151, 152 [272 P.2d 11] ; *Rader* v. *Thrasher,* 57 Cal.2d 244, 250 [18 Cal.Rptr. 736, 368 P.2d 360].) In *Bradner,*[3] the court stated at page 151: "It is plaintiff's contention that the advantage gained by the fiduciary must be an unfair advantage before the presumptions of section 2235 are properly in the case. We find no language in this section which imposes such an additional requirement."

The court then stated the principle in this language, at page 152: "When a fiduciary enters into a transaction with a beneficiary whereby the fiduciary's position is improved, or he obtains a favorable opportunity, or where he otherwise gains, benefits, or profits, it may fairly be said that an advantage has been obtained. To declare that the advantage obtained must be shown to be unfair, unjust, or inequitable before the presumptions arise would result in the imposition of a condition which is not required by section 2235."[4] This statement is quoted with approval in *Rader* v. *Thrasher, supra,* 57 Cal.2d 244 at 250.

---

[3] *Bradner* disapproved various cases in California which appeared to require that an unfair advantage first be established.

[4] There is no suggestion (nor could there be any) that plaintiff did not obtain "a favorable opportunity" out of the contract with defendant for he had the potential of acquiring a half interest in the Wilshire Tower property without putting up any money. Also, the court found that "The exposure of defendant was much greater in the transaction than the exposure of plaintiff."

Plaintiff's reliance on *Barnes* v. *Dobbins, supra,* 159 Cal. App.2d 737, is misplaced. That case was an affirmance of the trial court's decision in favor of the defendant trustee. The trial court found that there had been no breach of fiduciary duty and that the contract was fair and equitable. The suit involved an exchange of property between the plaintiff and the trustee. In support of his position, plaintiff relies upon this statement of the court in *Barnes,* at page 743: "Assuming *arguendo* a basis for recovery on constructive fraud, the judgment appealed from must be affirmed unless the finding of the trial court that plaintiff sustained no damage is unsupported by the evidence." The very next paragraph in *Barnes* puts the problem here under consideration in proper focus. It is there stated: "If this were an action by which plaintiff sought to rescind her contract and to disaffirm it, she might establish her case by proof of the confidential relationship and proof that the defendant gained some advantage, or that she suffered some detriment under the contract. (Civ. Code, § 2235; *Bradner* v. *Vasquez,* 43 Cal.2d 147 [272 P.2d 11].) In the present case, however, plaintiff does not seek to disaffirm her contract, but affirms it, and seeks to recover damages, and the burden of proof was on her to establish the amount of those damages." (159 Cal.App.2d at p. 743.) Thus, all that *Barnes* stands for is that where a beneficiary has not sought to avoid the contract but sues for damages, it is incumbent upon such party to establish damage. In the case at bench defendant has disaffirmed the oral agreement of joint venture with plaintiff and, on the authority of *Bradner* and *Ferrara* v. *La Sala, supra,* 186 Cal.App.2d 263, 271, the presumptions of section 2235 are activated by virtue of the conferring upon plaintiff of an advantage that "need not be an unfair advantage."

Plaintiff's contention that undue influence is irrelevant if the contract is fair overlooks the basic principle of section 2235. What plaintiff overlooks is that in a business venture between an attorney and his client, the client must be placed in a position that enables him to act meaningfully, voluntarily, and with full legal advice before any contract between him and his client involving such a venture can be sustained. The mere fact that the contract might be fair or even advantageous does not eliminate or nullify the fiduciary duty of the attorney. An important segment of that duty is not to take advantage of the client through the use of undue influence. The client is entitled to the benefit of full disclosure and adequate protective legal advice from her attorney against himself as though she were dealing with a third person.

■ Plaintiff further argues that, regardless of the presumptions of section 2235, defendant must be deemed to have ratified and acquiesced in the transaction so as to be foreclosed from relying upon that section. The factual basis for this contention is that plaintiff offered to step out of the deal at various times, that defendant urged him to stay in, and that she accepted the benefits of his participation in the venture. These offers of plaintiff to step out of the deal were made at the times when defendant insisted that he put up his share of the money. The first such occasion occurred at a meeting in November 1960 which, according to defendant's testimony, resulted in his finally agreeing to meet his share of the obligation that was then under consideration. On later occasions, for example, in April 1961, plaintiff came up with one-half of the money required for real estate taxes upon the demand of defendant. But the crucial fact is that throughout the period in question, defendant continued to be represented by plaintiff. And the vice of the contract between the parties, consisting essentially of the failure of plaintiff to render independent legal advice to defendant and his failure to make a full disclosure to her of her rights and liabilities, manifestly persisted throughout the period. Thus, it would appear that at no time up to the termination of the venture by the sale of the property in November 1961 was defendant in any position to ratify or acquiesce in plaintiff's role in the transaction since these same deficiencies and vices continued to permeate it. It is clear that a beneficiary can be deemed to have effected a ratification only after having full knowledge of all the facts bearing upon the decision. Any acquiescence or ratification on defendant's part would still be a transaction between counsel and his client and would itself be subject to the presumptions of section 2235.[5]

*Colton* v. *Stanford,* 82 Cal. 351 [23 P. 16, 16 Am.St.Rep. 137], relied on by plaintiff, involved the effort of plaintiff to set aside a settlement agreement which she entered into with defendants who had been co-venturers with her deceased husband. The settlement agreement was entered into as a result of a controversy in which she claimed that the defendants had defrauded her husband. Later she attempted to rescind the settlement agreement. In negotiating the settlement she was represented by her own lawyers and financial advisers. The settlement was entered into as an adversary

---

[5]It is appropriate to note that the case was neither pleaded nor tried on the theory of ratification.

agreement between plaintiff and defendants. In affirming a trial court judgment for defendants, the Supreme Court emphasized the absence of any fiduciary relationship at the time of the settlement agreement and the fact that plaintiff acted in reliance upon her own advisers and upon their thorough investigation of the factual circumstances. Clearly, *Colton* is of no assistance in the instant case.

Plaintiff's reliance on *Schmidt* v. *Mesmer*, 116 Cal. 267 [48 P. 54], *Lillard* v. *Walsh*, 172 Cal.App.2d 674 [342 P.2d 82], and *De Vrahnos* v. *George*, 203 Cal.App.2d 210 [21 Cal.Rptr. 481], is misplaced. There was no fiduciary relationship in any of these cases. *Phillips* v. *Sanger Lumber Co.*, 130 Cal. 431 [62 P. 749], is inapplicable to the facts of the instant case. Furthermore, there is no attorney-client relationship there involved.

In his reply brief plaintiff emphasizes the asserted fact that defendant made the initial suggestion to him that he join her as a co-venturer in the Wilshire Tower deal. He asserts that, "Section 2235 requires that there be inducement by the attorney" and argues that "where the beneficiary suggests the deal, and is in full possession of her faculties, it fairly can be said that no advantage was obtained by the trustee." Even a casual reading of the section demonstrates that there is no such qualification in the section. It sets up the standards to be observed in a business venture between an attorney and client. When such a contract is made which gives the attorney a benefit, advantage or opportunity, the presumptions provided for in section 2235 are immediately activated. In these circumstances it is the fact of the making of the contract that is crucial and not which of the parties made the suggestion.

In closing his reply brief, plaintiff states, "The decision below, unless reversed, will stand as an open door and invitation to fraud." The simple answer to this observation is that an attorney follow the obvious steps in dealing with a client that will enable him to meet charges of undue influence and inadequacy of consideration.

The judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied January 4, 1967. Appellant's petition for a hearing by the Supreme Court was denied February 8, 1967.