443 F.2d 597
 Adele Walsh PARKER and Ivon J. Parker, Appellants,
v.
WILLIAMS CONSTRUCTION CO., a California Corporation, and A.
J. Bumb, Receiver, Appellees.
WILLIAMS CONSTRUCTION CO., a corporation, and A. J. Bumb,
Receiver, Appellants,
v.
Adele Walsh PARKER and Ivon J. Parker, Appellees.
 Nos. 25278, 25335.
 United States Court of Appeals, Ninth Circuit.
 May 28, 1971.
 
 1
 Mark G. Ancel (argued), Baker, Ancel & Redmond, Leonard A. Goldman (argued), Goldman, Goldman & Arnold, Los Angeles, Cal., for Adele Walsh Parker and Ivon J. Parker.
 
 
 2
 David M. Richman (argued), Palm Springs, Cal., for Williams Constr. Co.
 
 
 3
 Before BARNES and ELY, Circuit Judges, and SOLOMON,* District judge.
 
 SOLOMON, District Judge:
 
 4
 This is a cross-appeal from an order of the Referee in Bankruptcy in a Chapter XI proceeding. Two issues are presented. The first is whether an attorney who entered a joint venture with her client to purchase a ranch had a fiduciary obligation to disclose the terms of a prior transaction in which the attorney traded the same ranch to a third party. The second is whether the Referee properly charged the attorney, who was the solvent joint venturer, with a portion of the costs of administering the joint venture property.
 
 
 5
 The Referee found that the ranch was the subject of a joint venture and ordered the proceeds divided equally after deducting administrative expenses and the payments necessary to remove encumbrances. The Referee also found that Adele Walsh Parker, an attorney, had no fiduciary duty to disclose the details of the transfer of the ranch prior to the transaction in which she and her client acquired the ranch as joint venturers.
 
 
 6
 The District Court affirmed the Referee's finding and order. Both parties appeal.
 
 
 7
 For many years, Adele Walsh Parker and Ivon J. Parker, her husband, owned free and clear a 2080 acre unimproved tract in San Diego County known as Sky Valley Ranch. In early December, 1963, a representative of the Seacoast Savings & Loan Association (Seacoast) called on the Parkers and offered to trade them for this ranch 51 improved properties which Seacoast had acquired by foreclosure. The offer required that the transaction be completed by December 31, 1963.
 
 
 8
 Seacoast and the Parkers agreed on a value of $700,000 for the 51 properties and a like amount for the ranch. The Parkers asked for an option to repurchase the ranch. Seacoast refused but suggested that the Parkers find a third party to take legal title to the ranch from Seacoast and have the third party give the Parkers the option.
 
 
 9
 On December 23, 1963, the Parkers and Seacoast prepared a proposed written agreement describing the terms of a three party transaction, with the name of the third party left blank. The trade of the ranch for the 51 improved properties was to be consummated through several related escrows.
 
 
 10
 One escrow required Seacoast to sell the ranch to a mutually acceptable party for $35,000 cash and a $665,000 loan from Seacoast secured by a trust deed, due within two years at 7 per cent interest payable quarterly. Portions of the ranch were to be released form the trust deed when payments were made on the principal. Another escrow required Seacoast to loan the Parkers, within the first six months of 1964, not less than 70 per cent of the agreed value of the 51 improved properties on secured loans without personal liability.
 
 
 11
 The Parkers needed an acceptable third party to take legal title to the ranch. The Williams Construction Company (Williams Co.), a client of Mrs. Parker, was engaged in real estate development. Mrs. Parker called Herald Williams, the president and principal shareholder of Williams Co., to find out whether Williams Co. would be willing to buy the ranch.
 
 
 12
 Williams said that he was interested in a joint venture agreement between the Parkers and Williams Co. to develop and sell the ranch in parcels, but that his company was short of cash. Mrs. Parker agreed to loan the company $35,000 for the down payment.
 
 
 13
 They agreed that Williams Co. would prepare a land development plan and sales brochures for the ranch and that the proceeds from sales would be used to pay the $665,000 loan. They also agreed to share the profits equally.
 
 
 14
 Mrs. Parker then recommended Williams Co. as the third party to purchase the ranch, and Williams Co. submitted a financial statement to Seacoast. Seacoast found the statement satisfactory and the agreements were signed. As part of the transaction, Mrs. Parker became a director of Williams Co. and signed the closing papers for Williams Co. The three party transaction was closed on December 31, 1963.
 
 
 15
 During the first six months of 1964, the Parkers borrowed $439,055.00 on the 51 properties as provided in the escrows.
 
 
 16
 The Parkers and Williams Co. each paid interest and taxes due on the ranch in 1964, but in 1965 they defaulted.
 
 
 17
 In April, 1965, Standard-Pacific Corporation, the successor in interest of Seacoast, filed a notice of default on the trust deed. Williams Co. then sued in the state court to restrain Standard-Pacific from foreclosing. The Parkers intervened. They alleged that Williams Co. had breached the joint venture agreement and that they owned the ranch, subject only to the trust deed.
 
 
 18
 In July, 1965, the state court restrained Standard-Pacific from foreclosing on the condition that the Parkers pay the accrued interest and foreclosure costs. The Parkers paid these amounts under their claim of ownership. The Parkers thereafter paid the interest due in June and September of 1965 and the taxes due in November, 1965, but they did not pay the amount due on the trust deed in December, 1965.
 
 
 19
 In January, 1966, Williams Co. filed a voluntary petition for an arrangement under Chapter XI of the Bankruptcy Act. The Referee took jurisdiction over the ranch. The Parkers objected because, even though Williams Co. had legal title to the ranch, they had possession and they claimed ownership.
 
 
 20
 The Referee restrained Standard-Pacific from foreclosing on the trust deed when it appeared that the value of the ranch was a half million dollars in excess of the amount due.
 
 
 21
 In February, 1967, when an offer was made to purchase the ranch, the Parkers joined with Williams Co. in a counteroffer.
 
 
 22
 Williams Co. and the receiver applied to the Referee for permission to sell the ranch free and clear of any liens. The Parkers objected to the terms of the sale, but when the Referee indicated that he might permit Standard-Pacific to proceed with the foreclosure, they acquiesced and waived court review of the Referee's order directing the sale. In order to give the new purchasers additional access to the ranch, the Parkers, for $6,000, also granted an easement over adjoining property which they owned.
 
 
 23
 The ranch was sold for $1,200,000.
 
 
 24
 In May, 1968, Williams Co. and the receiver filed an application to determine the interest of the Parkers in the proceeds of the sale. The application alleged that Mrs. Parker was a director of Williams Co. and its attorney and that she violated her fiduciary duty when she did not disclose all of her interests in both the trade and the sale of the ranch. Williams Co. contended that the Parkers' trade with Seacoast and the Parkers' joint venture with Williams Co. to purchase the ranch must be considered as a single transaction.
 
 
 25
 The Parkers filed their own petition to bar Williams Co. from obtaining any portion of the proceeds because Williams Co. had breached the joint venture agreement. The Parkers also asked to be reimbursed for expenses which they paid prior to the sale of the ranch.
 
 
 26
 The Referee found that Williams Co. did not breach its agreement. He also found that the parties had paid $103,722.00 and $27,770.22 for the joint venture.
 
 
 27
 The Referee also found that the joint venture was limited to the ranch and that Mrs. Parker had no duty to disclose any of the facts concerning the 51 properties which the Parkers acquired from Seacoast, or to account for any profits the Parkers will make on the trade.
 
 
 28
 The Referee ordered the proceeds of the sale of the ranch divided equally between Williams Co. and the Parkers, after deducting (1) the administrative expenses in bankruptcy attributable to the ranch, (2) the payments to remove encumbrances from the ranch, and (3) the amounts paid by the parties under their joint venture agreement.
 
 
 29
 CONTENTIONS OF WILLIAMS CONSTRUCTION CO.
 
 
 30
 Williams Co. contends that Mrs. Parker had a fiduciary duty to disclose the terms of the entire three party transaction and that the finding that the joint venture was limited to the ranch is clearly erroneous. It therefore attacks the order dividing equally between Williams Co. and the Parkers the net proceeds of the sale of the ranch.
 
 
 31
 Williams Co. does not contend that Mrs. Parker failed to disclose all of the details of the transaction by which it acquired an interest in the ranch. But it does contend that as a matter of law Mrs. Parker was required to disclose all of the details of the prior transaction by which the Parkers sold the ranch to Seacoast. It also contends that the good faith and personal honesty of Mrs. Parker, the favorable terms upon which it acquired an interest in the ranch, and the substantial profit that it will make on the sale of the ranch will not relieve Mrs. Parker of the obligation to share with it the profits the Parkers may make on the prior transaction.
 
 
 32
 We disagree.
 
 
 33
 California law requires an attorney who enters in a business transaction with his client to fully disclose the facts of the transaction, its legal consequences and the rights and liabilities of the parties. California Civil Code 2235; Gold v. Greenwald, 247 Cal.App.2d 296, 55 Cal.Rptr. 660 (1966). The Referee and the District Court both found that the business transaction between Mrs. Parker and her client was a joint venture limited to the ranch.
 
 
 34
 Mrs. Parker disclosed the facts about the ranch, the terms of sale and the joint venture. Her duty did not extend to disclosing all of the details of the transaction by which the Parkers had deeded the ranch to Seacoast.
 
 
 35
 There is an additional reason that Williams Co. cannot recover here. Herald Williams testified that before the closing of the escrow he knew that the Parkers traded Sky Valley Ranch to Seacoast in exchange for some properties which Seacoast had acquired by foreclosure, but that he did not learn of the agreement for secured loans between the Parkers and Seacoast until after the closing. Even if this is true, he did learn all the facts shortly after the closing. Thereafter, with full knowledge of the details of the trade, the loans, and the sale, Williams Co. without objection paid interest on the trust deed and taxes on the ranch. Williams Co. therefore ratified the transaction and cannot now complain of Mrs. Parker's alleged failure to fully disclose. Berry v. Maywood Mut. Water Co. Number 1, 13 Cal.2d 185, 88 P.2d 705 (1939); See-Tee Mining Corporation v. National Sales, Inc., 76 N.M. 677, 417 P.2d 810 (1966); 2 Fletcher Cyc. Corp. (Perm. Ed.) 775.
 
 CONTENTIONS OF THE PARKERS
 
 36
 The Parkers seek review of the order that the expenses of administration in bankruptcy attributable to the ranch be deducted from the proceeds of the sale before determining their share.
 
 
 37
 On this appeal, the Parkers assert that they as the solvent members of the joint venture, and not the Referee, were entitled to administer the joint venture property subject only to their duty to account for the proceeds of the sale under Section 5(i) of the Bankruptcy Act, 11 U.S.C. 23(i).[1]
 
 
 38
 In the proceedings before the Referee, the Parkers did not claim that they were entitled to administer the ranch for the joint venture. When the Referee first took jurisdiction over the ranch, the Parkers objected, not because of Section 5(i) of the Bankruptcy Act, but because they asserted that Williams Co. had no interest in the ranch. They later abandoned this assertion.
 
 
 39
 The Parker's contentions on appeal are inconsistent with their actions during the bankruptcy proceedings. Until after the ranch was sold by order of the Referee, the Parkers were content to have the ranch administered in bankruptcy. They actively sought the help of the Referee to continue the orders restraining Standard-Pacific from foreclosing its trust deeds. the Referee's action saved the property both for Williams Co. and for them.
 
 
 40
 The Parkers also actively participated in the proceedings before the Referee to sell the ranch at an attractive price. They accepted the price and terms of sale as ordered by the Referee, and they waived their right to review the order.
 
 
 41
 By these actions, the Parkers consented to the jurisdiction of the Bankruptcy Court. The deduction of administrative expenses attributable to the ranch from the proceeds of the sale was proper. Kaufman-Brown Potato Co. v. Long, 182 F.2d 594 (9th Cir. 1950).
 
 
 42
 The judgment of the District Court denying both the petition and the crosspetition for review of the Referee's order is affirmed.
 
 
 
 *
 Honorable Gus J. Solomon, United States District Judge, District of Oregon, sitting by designation
 
 
 [1]
 Section 5(i) of the Bankruptcy Act, 11 U.S.C. 23(i), provides as follows:
 'Where all the general partners are adjudged bankrupt, the partnership shall also be adjudged bankrupt. In the event of one or more but not all of the general partners of a partnership being adjudged bankrupt, the partnership property shall not be administered in bankruptcy, unless by consent of the general partner or partners not adjudged bankrupt; but such general partner or partners not adjudged bankrupt shall settle the partnership business as expeditiously as its nature will permit and account for the interest of the general partner or partners adjudged bankrupt.'