[Civ. No. 9950. Second Appellate District, Division One.—July 17, 1936.]

CLAIR WILSON, Respondent, v. GEORGE ANTHONY ZORB, Appellant.

Joseph Scott and Theodore C. Heyl for Appellant.

Henry G. Bodkin and Leonard Husar for Respondent.

THE COURT.—Defendant appeals from a judgment after verdict in an action for damages arising out of the admittedly negligent shooting of plaintiff by defendant. The defense was a pleaded satisfaction and release, and this defense was good unless the evidence of plaintiff was sufficient to show that the release had been obtained by fraudulent means. We have to determine whether the evidence was sufficient to support the jury's implied finding of fraud, as a result of which the release was held to be invalid.

Plaintiff and defendant were physicians; they had been close friends for many years, intimately associated in social activities and in their professional work, but not in other business matters. With their wives they frequently stayed at each other's houses and were in each other's company a great deal of the time. This long-continued friendship was not breached by the shooting of the plaintiff. When plaintiff left the hospital where he was confined for a number of weeks after a serious operation, he and his wife were taken into the home of the defendant where they lived for four or five months. During that time plaintiff received from defendant as compensation for his injuries a consideration of some $9,000, and he executed, during this period, a written release of all claims for damages arising out of the shooting, and also a written covenant not to sue either defendant or his wife, which instrument was also executed by the wife of plaintiff.

The alleged fraud which plaintiff contends vitiated these releases consisted of statements of defendant with reference to the condition of his finances, and certain promises of financial assistance in the future, which it is claimed were made without any intention of performing the same.

The record contains evidence that certain statements of fact and certain promises were made before the execution of the releases. In discussing this evidence we shall state as proven facts the representations and promises testified to by plaintiff and his witnesses, and shall state such further facts, tending to disprove the charge of fraud, as were established without contradiction.

The shooting occurred on February 26, 1933. Plaintiff came to defendant's home from the hospital about April 8, 1933, and the written release was executed May 17, 1933.

The covenant not to sue was executed July 5, 1933. Before the release was executed defendant represented that he had lost some $50,000 in stock market speculation; there was no evidence that this statement was untrue. He stated the stocks that he and his wife owned outright were worth very little; there was no evidence that this statement was untrue. He stated that his practice had suffered by reason of the publicity which he had received on account of the shooting; this statement was not untrue. He stated that he was being robbed by the operators of an oil well on a lot he owned in the Venice oil field, and that he was not getting royalty from the well. This statement was made in the month of May and it was true that during that month he received no royalties and it was also true that while royalties were resumed later and after the release was executed, at the rate of $200 or $300 per month, yet the evidence showed that the company went into receivership and the record does not disclose the length of time such royalties were paid nor the total amount thereof. He stated that the income from the oil well had been kept in a separate fund amounting to $50,000 or $60,000, which had been depleted by his losses and expenses, and that perhaps some of the amount had been dissipated by his wife. It was not shown how much money had ever been in such fund, if any, nor that the same had not been consumed in losses and expenses. He stated, according to one witness, that he owed the government $51,000 for past due income taxes, which he had succeeded in having reduced to $22,000. Plaintiff and his wife testified that defendant stated he owed the government $22,000 and that he did not know how he was going to meet the debt. About three months after the second release was executed, defendant paid the government $11,000 in settlement of its claim for past due income tax. No evidence was given as to the amount of the claim which the government was asserting at the time the settlement was made between plaintiff and defendant, nor was there any evidence that at the time defendant made such statements he did not honestly believe that he would be required to pay the sums the government was demanding. He stated that his property was mortgaged to such an extent that he could not borrow any money on it. It was a fact that one parcel of land was subject to a trust deed in the amount of $9,000, and no evidence was given as to the value

of the property, consequently it was not proved that defendant stated an untruth when he said he could not borrow more money on it. It was stipulated that he owned other parcels of land but no evidence was given as to the value of all or any part of it nor whether it was of such value or character that money could be borrowed on it. Plaintiff testified that he had overheard the wife of defendant state that their home had been mortgaged for $17,500, and that the debt had been paid down to $10,000. He also testified that defendant had told him that he, defendant, had asked his wife to mortgage the property and that she had said that it had been mortgaged for $17,500, and that the debt had been paid down to $10,000, and that she would not further encumber it, and plaintiff further testified that defendant had said to him that the mortgage was still on the property, this last statement being made in response to a leading question of his counsel. The facts with reference to this encumbrance were that the property had been subject to a trust deed of $10,000, which had been paid off shortly before the shooting occurred. No evidence was given as to the value of this property. Defendant represented that his finances were in "terrible shape". In addition to the facts which we have already stated, it appears without contradiction that the expenses and losses of defendant which resulted from the shooting cost him $25,000. The statement that his finances were in terrible shape does not appear to have been a misstatement of fact nor the statement of an exaggerated opinion. No evidence was given as to any representation made by defendant as to his total financial worth, nor as to the total amount of his debts. He did not represent that he was insolvent nor that he would be unable to pay any judgment that could be recovered against him. He was a successful physician and surgeon with a very considerable earning power, which facts, so far as the record discloses, must have been well known to the plaintiff. Defendant did not deny his liability nor his willingness to pay, nor his ability to pay, except by such general statements as that he never would be able to pay plaintiff enough to compensate him for his injury. We are unable to determine from the record what the financial worth of the defendant was, or what he represented it to be.

The promises which defendant made, and which it is claimed were made fraudulently, were the following: He

stated that he would pay plaintiff's bills and expenses until he was able to resume his practice. In this connection he paid $1,000 or more, of such expenses including those incurred by reason of plaintiff's confinement in a hospital. He paid, or rather his wife paid, to plaintiff the sum of $1500 at the time of the execution of the second release, at which time plaintiff represented to defendant and his wife that his indebtedness amounted to $2,600. Defendant's wife at that time told plaintiff to compromise with his creditors and stated that he could probably settle the debts of $2,600 for the sum of $1500, but that any more money would have to come from the defendant and not from her.

Plaintiff after this time never made any demand upon defendant for the payment of any further sum upon account of the debts or upon any other account, although defendant did, on several occasions, when they were out together, give plaintiff sums ranging from $10 to $20. Defendant promised plaintiff that he and his wife could live in the home of defendant until plaintiff was able to return to work. Upon his release from the hospital plaintiff and his wife did live in defendant's home for some five months and were asked to leave the same only because defendant's wife was returning from a trip to Honolulu and defendant desired to fix up the house before she arrived. Apparently plaintiff moved into his own home at this time without objection and never thereafter sought a residence in defendant's home. Defendant promised that he would help plaintiff financially as long as he needed help,—that he would always help him. It does not appear that plaintiff ever requested such help or that it was ever refused him, nor does it appear that at the time he left defendant's home plaintiff was unable to carry on his practice. In addition to the sums of money given to plaintiff and paid out for his use, there was assigned to plaintiff a promissory note of $6,000, secured by a trust deed upon land belonging to the mother and father of plaintiff. This money had previously been loaned to them by defendant but for the plaintiff's use, and the note and trust deed were accepted by plaintiff as the equivalent of $6,000 cash.

This evidence, in our opinion, was insufficient to support any finding of fraud.

Plaintiff places much emphasis upon the relationship of the parties, claiming that the facts disclosed a fiduciary relationship which made it necessary for the jury and the trial court, and which makes it necessary for this court, to judge the transaction between the parties under the strict rules applying to fiduciaries. This question is presented to us in the following manner: the court instructed the jury that the evidence did not disclose the existence of a fiduciary relationship between the parties. Appellant did not and could not complain of this instruction which was entirely favorable to him. We must assume that the jury followed this instruction of the court and based its verdict upon a finding of actual fraud. Therefore, it becomes necessary to determine whether a fiduciary relationship existed, only because that fact has an important bearing upon the sufficiency of the case made out by plaintiff to impeach the written satisfaction of his claim.

If a case of constructive fraud was established by sufficient evidence, we would not be justified in reversing a just and proper judgment for the reason that it had been reached by erroneous processes of reasoning or the application of wrong legal principles. We have read the testimony of which a brief summary has been given, and have been unable to find in the facts established the substance of a fiduciary relationship. Warm friendship, confidence and an affectionate regard for each other were mutual with the parties, and yet each was self-sufficient, competent and independent. At times each attended and prescribed for the other's patients and they consulted with each other in professional matters. Such relationships happily are common, but they are not confidential relationships in a legal sense. It takes something more than friendship or confidence in the professional skill and in the integrity and truthfulness of another to establish a fiduciary relationship. The law recognizes certain relationships as confidential *ex propria vigore,* and by reason thereof presumes the existence and the exercise of dominating influence in transactions advantageous to the trustee, without inquiry as to the existence or extent of such influence as a fact. In such cases the domination by the trustee is the presumed legal consequence of the relationship, while in other cases facts must be shown sufficient to justify a reasonable inference of domination, and from proof of such facts the

confidential relationship follows. We refrain from citation of authorities in support of these fundamental principles. In our opinion, no sufficient facts were shown to prove a confidential relationship in a legal sense. It is not to be questioned that plaintiff had every right to place great reliance upon the statements of defendant. They dealt with each other as friends, and that fact precludes the idea that they did not trust each other. It is therefore altogether reasonable to conclude that plaintiff believed the statements and relied upon the promises of defendant, although he might well have been doubtful and suspicious of the same declarations made by a stranger. But when we concede, as we must under the implied finding of the jury, that plaintiff implicitly believed the statements of defendant and that he relied upon the performance of defendant's promises, we have given full effect to the relationship shown by the evidence to have existed. Plaintiff was not forced to execute the releases. When the $6,000 note and trust deed were assigned to plaintiff on May 17th, defendant produced the release from his pocket and asked plaintiff if he had any objection to signing it. Plaintiff replied that he had none and signed and delivered the release to defendant. Plaintiff received $1500 in cash from defendant's wife at a bank and later, at defendant's home, plaintiff voluntarily executed and delivered to defendant's wife the covenant not to sue defendant which plaintiff, of his own volition, had had prepared by an attorney some time in the preceding March. Defendant was not present on the occasion of the delivery of this agreement to defendant's wife. At the request of defendant's wife, plaintiff added a stipulation which he and his wife signed, to the effect that defendant's wife was released from all obligations to them or either of them. If defendant's statements were falsely and fraudulently made, and if his promises were made without intention of fulfilling them, and by reason thereof the covenant not to sue was executed, it would have been invalid whether the parties dealt as friends or as strangers, but if the agreement would have been valid as between strangers, it was valid as between plaintiff and defendant notwithstanding their friendship. ▉ In either event, defendant would have had no right to misstate material facts or to make false promises, but in neither case was he obliged to make any voluntary disclosure as to his wealth

or his ability to pay. While a debtor has no right to defraud his creditor into a settlement of an admitted debt by false statements as to his solvency, he is under no obligation to make a voluntary disclosure of the same or of any facts pertaining thereto.

We summarize the case presented to the jury upon the entire record together with our conclusions as follows: At no time did plaintiff make any statement as to the amount he expected to receive or thought he should receive from defendant, nor did he intimate any intention to press a claim for damages. Defendant's actions in the matter were voluntary and spontaneous. He did not deny nor try to evade his obligations; in fact, he expressed a wish to adequately, or at least substantially, compensate plaintiff and to deal with him justly. He asked that he be given time because of the condition of his finances, and plaintiff was willing to grant this time; when plaintiff executed the release on May 17th, he expected to receive, and defendant expected to pay, some further consideration, the amount of which was not agreed upon, and plaintiff gave the release relying upon defendant's promise of further monetary compensation. The argument that plaintiff was induced to execute the release by his belief in false statements as to defendant's financial worth is unsupported by the evidence. Moreover, it is wholly inconsistent with the admitted fact that in giving the release plaintiff was satisfied that defendant not only could but would make a further settlement, as outlined in plaintiff's testimony.

The statements of defendant as to the condition of his finances were substantially true, so far as disclosed by the record. Such inaccuracies as we have pointed out become quite insignificant in view of the fact that defendant did not pretend to be insolvent, did not state facts from which his insolvency was to be inferred, nor deny his ability to make any reasonable settlement which plaintiff might demand. In fact, the terms of the settlement were agreed upon. They were indefinite, it is true, but they were as much the terms of plaintiff as of defendant.

On July 5th, when the covenant not to sue was executed, plaintiff expected to receive enough money to pay his bills amounting to $2,600, but he received only the sum of $1500. He made no objection to the suggestion of the defendant's

wife that he endeavor to compromise the claims of his creditors and so far as the record shows, he may have effected such compromises. He did not demand the remainder of the money and the most that he claims is that when he discussed generally with defendant the condition of his finances, defendant changed the subject. Accepting the plaintiff's testimony as true, he was still entitled to an additional sum of $1100, and he expected that defendant would give him further financial assistance in an indefinite amount and at indefinite times in case he should be in need thereof. A finding of fraud in the making of these promises cannot be supported except by evidence that they were made without intention of fulfilling them, and the record contains no sufficient evidence of this fact. Had defendant intended to repudiate his promises, he would not have paid plaintiff the sum of $1500, after obtaining the release of May 17th. ██ If he had obligated himself to pay a further sum in settlement of plaintiff's bills, having paid altogether some $2,500, he was at least entitled to an opportunity to pay the same before being charged with a breach of his agreement. No time was agreed upon within which he was to pay plaintiff's bills nor did he refuse to pay them. The informal and general nature of the agreement was such that defendant was entitled to receive from plaintiff a demand for payment and to a reasonable time thereafter within which to make payment, but he was accorded neither. One who makes a promise to do something in the future, having the ability to do it, and no time having been specified for performance, does not violate his agreement until he refuses to perform after demand made. Here the implied finding of the jury is that defendant's promises were made without intention to perform the same. In support of this finding plaintiff can rely upon nothing except the alleged failure of defendant to carry out his promises. This, at most, furnishes dubious and, upon the entire facts before the jury, insufficient evidence of a fraudulent intent.

After a painstaking review of the evidence we are convinced that a case was not presented to the jury which justified the annulment of a settlement freely made by competent contracting parties.

The judgment is reversed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 15, 1936, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 14, 1936.