[Civ. No. 50953. First Dist., Div. Three. July 26, 1983.]

BARBARA A., Cross-complainant and Appellant, v.
JOHN G., Cross-defendant and Respondent.

**COUNSEL**

Mary Cynthia Dunlap for Cross-complainant and Appellant.

Long & Levit, Ronald E. Mallen, Donald W. Carlson and Marsha L. Morrow for Cross-defendant and Respondent.

OPINION

BARRY-DEAL, J.—The issue presented in this appeal is whether a woman (appellant) suffering injuries from an ectopic pregnancy[1] has a cause of action in tort against the responsible man (respondent) for his misrepresentations of infertility. The trial court ruled that no cause of action would lie and granted respondent's motion for judgment on the pleadings. We reverse the judgment.

## I. *Procedural Background*

Respondent, an attorney, filed an action in municipal court against appellant for $1,520 in fees for representing her in a family law matter. Appellant filed her answer and a cross-complaint for damages alleging, inter alia, fraud and legal malpractice, and the action was transferred to the superior court. After a demurrer to the cross-complaint was filed, appellant by stipulation filed her first amended cross-complaint, which is the subject of this appeal. After several hearings on the demurrer to the amended cross-complaint, the court (Kongsgaard, J.) sustained a demurrer to the count alleging intentional/negligent infliction of emotional distress and dismissed the two counts alleging legal malpractice for appellant's failure to amend.[2] The court overruled the demurrer to the count alleging battery and the one alleging intentional misrepresentation, in spite of respondent's argument that an action was barred by Civil Code section 43.5, the "antiheart balm" statute.[3]

Prior to trial, on May 12, 1980, the Second District filed its opinion in *Stephen K.* v. *Roni L.* (1980) 105 Cal.App.3d 640 [164 Cal.Rptr. 618], holding that a man stated no cause of action in a cross-complaint against a woman for misrepresentations about her use of birth control in an action brought by her to establish paternity of their child and to impose on him an obligation for child support. In the case at bar, the court (Sherwin, J.) agreed with respondent that *Stephen K.* v. *Roni L.* was controlling and granted his motion for judgment on the pleadings, which was entered on

---

[1] In an ectopic pregnancy, the impregnated ovum develops outside the cavity of the uterus. (Stedman's Medical Dict. (3d unabridged lawyers' ed. 1972) p. 1013.) A tubal pregnancy, which occurred in the case before us, is an ectopic pregnancy where the fertilized ovum develops in the oviduct, also referred to as the fallopian tube or tuba uterina. (*Id.,* at pp. 903, 1014.) Respondent incorrectly refers to an ectopic pregnancy as a false pregnancy (pseudocyesis), a condition in which some of the signs and symptoms suggest pregnancy, although the woman is not in fact pregnant. (*Id.,* at pp. 1013, 1033.)

[2] The court also granted respondent's motion to disqualify appellant's attorney.

[3] Civil Code section 43.5, enacted in 1939, provides: "No cause of action arises for:
"(a) Alienation of affection.
"(b) Criminal conversation.
"(c) Seduction of a person over the age of legal consent.
"(d) Breach of promise of marriage."

July 25, 1980. Respondent's complaint for fees was remanded to the municipal court for resolution.

## II. *Standard of Review and Factual Allegations*

■ A motion for judgment on the pleadings based on failure to state a cause of action has a function similar to that of a general demurrer. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, §§ 161-170, pp. 2816-2823.) On review of the judgment in either case, all material facts alleged in the pleading under attack must be accepted as true.[4] (*Marvin v. Marvin* (1976) 18 Cal.3d 660, 666 [134 Cal.Rptr. 815, 557 P.2d 106]; *Kachig* v. *Boothe* (1971) 22 Cal.App.3d 626, 630 [99 Cal.Rptr. 393].) As a reviewing court, we, of course, are not bound by the trial court's determination on whether the alleged facts state a cause of action. With these rules in mind, we summarize the essential facts alleged in appellant's first amended cross-complaint.

Appellant and respondent met about April 1978. Appellant retained respondent, an attorney, to represent her in a postdissolution proceeding for modification of spousal support and child support for her three children; the legal relationship was in existence at the time of the alleged events. On two occasions, June 25 and June 30, 1978, she and respondent had sexual intercourse with each other. Before they engaged in sexual intercourse the first time, appellant demanded that respondent use a contraceptive device, i.e., a condom, and explained that for emotional and financial reasons she did not want to become pregnant. Appellant further told respondent ". . . that she would not engage in sexual intercourse with him if there was any likelihood of her becoming pregnant; . . ." Respondent told appellant not to worry, saying, " 'I can't possibly get anyone pregnant.' " She understood this to mean that he was sterile by nature or as the result of a vasectomy.

Respondent's representation about his procreative inability was false, and he knew it was false. It was made with the intent to induce appellant to engage in sexual intercourse, protected or not. Appellant, relying on respondent's assurance of his sterility, consented to and did engage in sexual intercourse with respondent. The attorney-client relationship produced in appellant a sense of trust in respondent, and she justifiably relied on his representations.

---

[4]In his answer, respondent denies not only the representations but also the acts of intercourse. We, however, consider only the allegations in the cross-complaint.

Neither appellant nor respondent directed much attention to the sufficiency of the allegations in the first amended cross-complaint. Instead, each party emphasized public policy considerations and constitutional issues, which we discuss later.

As a result of sexual intercourse with respondent, appellant became pregnant. The pregnancy was determined to be tubal, and, as a consequence, appellant was forced to undergo surgery to save her life. Her fallopian tube was removed, and she was rendered sterile by the surgery.[5] She suffered physical, emotional, and financial injuries as a result of the pregnancy.

### III. *Cause of Action on Theories of Battery or Deceit*

■ Based on the alleged facts, appellant has stated a cause of action in battery, i.e., an unconsented invasion of her interest in freedom from intentional, unlawful, and harmful or offensive contact with her person. (See Prosser, Torts (4th ed. 1971) § 9, pp. 34-37 [hereafter cited as Prosser]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 194, pp. 2482-2483.) Consent to an act, otherwise a battery, normally vitiates the wrong. (*Delia S.* v. *Torres* (1982) 134 Cal.App.3d 471, 480 [184 Cal.Rptr. 787]; Prosser, *supra,* § 18, p. 101.) However, appellant has alleged alternate grounds for invalidating her consent and rendering respondent's act a battery: (1) that the act of impregnation exceeded the scope of the consent (see *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 239-240 [104 Cal.Rptr. 505, 502 P.2d 1]; *Estrada* v. *Orwitz* (1946) 75 Cal.App.2d 54, 57 [170 P.2d 43]), and (2) that the consent to intercourse was fraudulently induced (Prosser, *supra,* § 18, p. 105; see *Butler* v. *Collins* (1859) 12 Cal. 457, 463). As she has alleged physical, emotional, and financial damage proximately caused by the wrongful touching, appellant's cause of action for battery was sufficiently pleaded.

As an alternative theory for recovery in tort, appellant pleaded deceit, an action sanctioned by Civil Code section 1709, which provides: "One who willfully deceives another with intent to induce him [or her] to alter his [or her] position to his [or her] injury or risk, is liable for any damage which he [or she] thereby suffers." Deceit, within the meaning of section 1709, is defined by Civil Code section 1710[6] to include both fraudulent misrepresentations ("The suggestion, as a fact, of that which is not true, by one who does not believe it to be true . . .") and negligent misrepresentations ("The assertion, as a fact, of that which is not true, by one who has no reasonable

---

[5]Appellant does not explain what happened to her second fallopian tube, but this is a matter of proof at trial.

[6]Civil Code section 1710 provides: "A deceit, within the meaning of the last section, is either:

"1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

"2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

"3. The suppression of a fact, by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of fact; or,

"4. A promise, made without any intention of performing it."

ground for believing it to be true . . ."). (See, generally, 4 Witkin, Summary of Cal. Law, Torts, *supra*, §§ 445-482, pp. 2710-2744; Prosser, *supra*, ch. 18, §§ 105-110, pp. 683-736; Rest.2d Torts, §§ 310, 557A.)

■ In pleading a cause of action for deceit, a plaintiff must specifically plead the following elements: (1) a false representation (ordinarily of a fact) made by the defendant; (2) knowledge or belief on the part of the defendant that the representation is false, or that the representation was made by defendant without reasonable grounds for believing its truth; (3) an intention to induce the plaintiff to act or to refrain from action in reliance upon the misrepresentation; (4) justifiable reliance upon the representation by the plaintiff; (5) damage to the plaintiff, resulting from such reliance. (See Prosser, *supra*, § 105, pp. 685-686; *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487-489 [275 P.2d 15]; *O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798, 804-805 [142 Cal.Rptr. 487].)

■ Appellant has pleaded all the essential allegations, as set forth above, of a cause of action for deceit. Respondent's challenge to the sufficiency of the pleading, i.e., "She does not allege that she asked him what he meant by that ambiguous statement ["'I can't possibly get anyone pregnant'"] . . . ," is meritless. His proposed allegation relates to proof of justifiable reliance at trial, not to sufficiency of the pleading.

## IV. *Basic Rule*

■ It is a fundamental principle of our system of jurisprudence that for every legal wrong there is a remedy (Civ. Code, § 3523), and that an injured party should be compensated for all damage proximately caused by the wrongdoer unless a departure from the basic principle is mandated by a legislative exception or by strong public policy. (*Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 433 [58 Cal.Rptr. 13, 426 P.2d 173]; *Murdock* v. *Murdock* (1920) 49 Cal.App. 775, 782-783 [194 P. 762], citing Civ. Code, §§ 1667, 1708, 1709, 3523, and 2224; cf. *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 111-112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], characterizing Civ. Code, § 1714, as a basic principle of tort law.)

## V. *The "Antiheart Balm" Statute*

Respondent asserts that appellant's action comes within the statutory exception declared in Civil Code section 43.5 and is thus barred. We find that statute is not applicable. Section 43.5 provides, in relevant part, "No cause of action arises for: . . . [¶] (c) Seduction . . . ." The word "[s]eduction," as used in the statute, is a term of art involving elements substantively different from those alleged by appellant.

■ "Seduction imports the idea of illicit intercourse accomplished by the use of arts, persuasions, or wiles to overcome the resistance of a female who is not disposed of her own volition to step aside from the paths of virtue. [Citation.]" (*Davis* v. *Stroud* (1942) 52 Cal.App.2d 308, 317 [126 P.2d 409].) It is no longer possible for two consenting adults in the State of California to engage in "illicit intercourse." (See Note, *California "Consenting Adults" Law: The Sex Act in Perspective* (1976) 13 San Diego L.Rev. 439.)

The old action for seduction required that the woman was ". . . chaste and virtuous at the time of the alleged seduction . . ." (*Davis* v. *Stroud, supra,* 52 Cal.App.2d at p. 316), and it was used primarily to protect young, inexperienced women who had succumbed to the sexual advances of older men. (See *Carter* v. *Murphy* (1938) 10 Cal.2d 547 [72 P.2d 1072].)

■ In the instant case appellant complains not because her virtue was violated or because she suffered humiliation and loss of reputation, but because the sexual act was *unprotected and led to an ectopic pregnancy* as a result of respondent's *misrepresentation*. The gravamen of the complaint in this situation is substantially different from an action for "[s]eduction," which is indeed precluded by Civil Code section 43.5.[7] (Cf. *Mack* v. *White* (1950) 97 Cal.App.2d 497, 500 [218 P.2d 76].)

Nevertheless, respondent argues that the public policy considerations underlying the statutory bar to seduction actions are sound and are applicable to the case before us. He points out that seduction actions are ". . . fruitful sources of fraud and extortion because of the ease with which they may be employed to embarrass, harass and besmirch the reputation of one wholly innocent of wrongdoing . . . ," quoting from *Ikuta* v. *Ikuta* (1950) 97 Cal.App.2d 787, 789 [218 P.2d 854]. He predicts a multitude of unfounded or fraudulent claims if appellant's claim is allowed.

Our Supreme Court has held that fear of unfounded or fraudulent claims is not a valid reason for disallowing a tort action predicated upon a meritorious claim. In *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], the court stated: "[t]he possibility that some fraud will escape detection does not justify an abdication of the judicial responsibility to award damages for sound claims: if it is 'to be conceded that our procedural system for the ascertainment of truth is inadequate to defeat fraudulent claims . . . , the result is a virtual acknowledgment that

---

[7]The Legislature has retained in Penal Code section 268 criminal sanctions for "[e]very person who, under promise of marriage, seduces and has sexual intercourse with an ummarried female of previous chaste character. . . ."

the courts are unable to render justice in respect to them.' [Citation.]" (*Id.*, at p. 737.) The reasoning is sound and is applicable to the case before us.

## VI. *Inapplicability of Stephen K.*

Appellant argues that the trial court mistakenly relied on *Stephen K.* v. *Roni L., supra,* 105 Cal.App.3d 640, because that case is factually distinguishable and the public policy considerations underlying the two actions differ. Respondent reiterates that appellant's action contravenes public policy ". . . to eliminate governmental intervention into private sexual dealings . . . ," as enunciated in *Stephen K.*

In that case, Stephen, the defendant in a paternity action, after admitting paternity, cross-complained against Roni, the mother of the child, claiming that she had falsely represented that she was taking birth control pills. The father alleged that in reliance upon such representation, he engaged in sexual intercourse with Roni, which eventually resulted in the birth of a baby unwanted by the father. He further alleged that as a proximate result of the misrepresentation, he had become obligated to support the child financially and had suffered mental distress.

In affirming the dismissal of Stephen's cross-complaint, the court held that Roni's misrepresentation was not actionable and gave rise to no liability. (*Id.,* at p. 642.) In summary, the court concluded that ". . . the circumstances and the highly intimate nature of the relationship wherein the false representations may have occurred, are such that a court should not define any standard of conduct therefor." (*Id.,* at p. 643.) The court added that to ". . . supervise the promises made between two consenting adults as to the circumstances of their private sexual conduct . . . would encourage unwarranted governmental intrusion into matters affecting the individual's right to privacy . . . ," and that ". . . as a matter of public policy the practice of birth control, if any, engaged in by two partners in a consensual sexual relationship is best left to the individuals involved, free from any governmental interference." (*Id.,* at pp. 644-645.)

The facts in *Stephen K.* and in the case before us, both based on deceit, are obviously similar. A significant distinction between the cases, however, lies in the element of damage. In essence, Stephen was seeking damages for the "wrongful birth" of his child[8] resulting in support obligations and al-

---

[8]The so-called "wrongful birth" cases were rejected by the *Stephen K.* court as precedent for Stephen's claim for two reasons: "First, in none of those cases did the plaintiffs seek so radical a change in the socially accepted ideas and views of sexual conduct, family relationship, parental obligations, and legal and moral responsibility for one's own conduct as does Stephen. Secondly, in those cases the facts and the relationship of the parties-litigants are

leged damages for mental suffering. Here, no child is involved; appellant is seeking damages for severe injury to her own body.

Although the *Stephen K.* court alluded to Stephen's claim as separate and apart from the issue of either parent's obligation to raise and support the child, it reached its decision without attempting to resolve the problem of the mother's reduced financial ability to support the child if she were required to pay damages to the father. We think this concern over the child, and not governmental intrusion into private sexual matters, which we discuss below, is the central issue in *Stephen K.* and compels different public policy considerations.

Civil Code section 196a imposes on the natural father as well as the natural mother of a child the obligation to give the child support and education suitable to his or her circumstances. To assess damages against the mother for false representations about birth control would have the practical effect of reducing or eliminating support from the father by way of offset. Erasing much or all of the father's financial support, to the detriment of the child, is clearly against public policy and the statutory mandate.

Further, we think it is not sound social policy to allow one parent to sue the other over the wrongful birth of their child. Using the child as the damage element in a tortious claim of one parent against the other could seldom, if ever, result in benefit to a child.[9] Such a lawsuit would indeed be strong evidence of parental rejection, which could only be emotionally detrimental to the child. Such an action, with its potential for engendering disharmony between a mother and father, would also be contrary to the spirit of the recent legislation providing for mediation between parents in order to reduce acrimony. (See Civ. Code, § 4607.)

In short, we agree with the *Stephen K.* court that Roni's misrepresentation was not actionable, but we find that different policy reasons justify that result. The question remains, however, whether allowing appellant's action in the case before us encourages ". . . unwarranted governmental intrusion

---

different." (*Id.*, at p. 643.) The actions have uniformly been instituted by parents against health professionals for negligence causing the birth of a child or the birth of an impaired child. For cases and discussion, see *Turpin* v. *Sortini* (1982) 31 Cal.3d 220, 225-228 [182 Cal.Rptr. 337, 643 P.2d 954]; *Stephen K.* v. *Roni L., supra,* 105 Cal.App.3d 640, 643-644.

[9]In response to *Curlender* v. *Bio-Science Laboratories* (1980) 106 Cal.App.3d 811 [165 Cal.Rptr. 477], which suggested ". . . possible parental liability [to the child] for deciding to conceive or failing to abort a potentially defective child, the Legislature enacted section 43.6 of the Civil Code, effective January 1, 1982. Section 43.6 relieves the parents of any liability in this situation . . . ." (*Turpin* v. *Sortini, supra,* 31 Cal.3d 220, 228.) Although this section does not refer to intraparental tort actions based on misrepresentations, we think it is consistent with our conclusion that such actions are contrary to public policy.

into matters affecting the individual's right to privacy . . ." and thus contravenes public policy.

## VII. *Privacy Right Not Absolute*[10]

■ The constitutional right to privacy extends to all matters relating to marriage, family, and sex. (*People* v. *Belous* (1969) 71 Cal.2d 954, 963 [80 Cal.Rptr. 354, 458 P.2d 194]; Cal. Const., art. I, § 1; *Stanley* v. *Georgia* (1968) 394 U.S. 557, 564 [22 L.Ed.2d 542, 549, 89 S.Ct. 1243]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678]; *Eisenstadt* v. *Baird* (1972) 405 U.S. 438 [31 L.Ed.2d 349, 92 S.Ct. 1029].) The right to privacy, however, is not absolute, and governmental intervention in matters affecting an individual's right to privacy in sexual matters has been sanctioned in both criminal and civil law.

California has adopted a general scheme for the regulation of the criminal aspects of sexual activity and has determined when sexual intercourse between persons not married to each other shall be criminal. (*In re Lane* (1962) 58 Cal.2d 99, 102-104 [22 Cal.Rptr. 857, 372 P.2d 897] [citing specific penal statutes].) Prosecution under many of the penal statutes, covering both consensual and forcible sexual acts, often requires testimony of a far more intimate sexual nature than in the case before us. The victim of many of the proscribed acts suffers an invasion of privacy in both the act and the required testimony. And, the state has a fundamental right to enact laws which promote public health, welfare, and safety, even though such laws may invade the offender's right of privacy. (*People* v. *Mills* (1978) 81 Cal.App.3d 171, 181 [146 Cal.Rptr. 411] [compulsory registration of convicted sex offenders].)

Even sexual relations within marriage, long held sacrosanct, have recently been opened to scrutiny when a spouse complains of forcible sexual intercourse. (Pen. Code, § 262.) The ancient policy of protecting the privacy of the marriage bed is outweighed in the modern view by the grievous harm to a man or woman caused by spousal rape. (See Freeman, *"But If You*

---

[10]Both parties raise the issue of equal protection under the law. We do not view our holding as raising that issue. A man who suffers physical injury as a result of his female partner's intentional misrepresentation will have the same right to seek legal redress as does appellant in the case at bench.

Furthermore, although the different treatment of men and women must be examined with strict scrutiny (*Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 15-20 [95 Cal.Rptr. 329, 485 P.2d 529]), such treatment may be justified where men and women are not similarly situated (*Schlesinger* v. *Ballard* (1975) 419 U.S. 498, 508 [42 L.Ed.2d 610, 618, 95 S.Ct. 572].) Since it is obvious that men and women are not similarly situated with regard to the risk of pregnancy, any difference in treatment of them which may be perceived in our holding is justified.

*Can't Rape Your Wife, Who[m] Can You Rape?"*: *The Marital Rape Exemption Re-Examined* (1981) 15 Fam. L.Q. 1.)

In the civil law, for example, our Legislature has recently amended Evidence Code section 621 to state a limited exception to the rule that the issue of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage. (See also Civ. Code, § 7004, subd. (a).) Either husband or wife, under certain circumstances, can bring an action to establish that the husband is not the biological father of his wife's child. (Evid. Code, § 621; cf. *Michelle W.* v. *Ronald W.** (Cal.App.).) Here, traditional notions about the inviolability of certain aspects of human relationships have given way to recognition that former "protection" in reality worked hardship and injustice in many cases.

Where paternity of a child is at issue, the mother cannot refuse to answer all relevant questions about her sexual activity on the plea that it is a private matter. Her right of privacy must yield to " 'the historically important state interest of facilitating the ascertainment of truth in . . . legal proceedings.' [Citation.]" (*Fults* v. *Superior Court* (1979) 88 Cal.App.3d 899, 904 [152 Cal.Rptr. 210].) Nor can a man invoke the right of privacy to avoid a determination of paternity of a child he has fathered. (See Uniform Parentage Act (Civ. Code, §§ 7000-7021).)

Although the right to privacy is a freedom to be carefully guarded, it is evident that it does not insulate a person from all judicial inquiry into his or her sexual relations. We do not think it should insulate from liability one sexual partner who by intentionally tortious conduct causes physical injury to the other. (Cf. *Marvin* v. *Marvin, supra,* 18 Cal.3d 660, 682, fn. 21.) Public policy does not demand such protection for the right of privacy.

### VIII. *Analogy to Venereal Disease Cases*

Three out-of-state cases, without discussing public policy or the right to privacy, have held that a woman's consent to sexual intercourse was vitiated by the man's fraudulent concealment of the risk of infection with venereal disease or infestation with vermin. (See *De Vall* v. *Strunk* (Tex.Civ.App. 1936) 96 S.W.2d 245 [single woman, seduced by promise of marriage, had action in battery against man who infected her with crab lice]; *Crowell* v. *Crowell* (1920) 180 N.C. 516 [105 S.E. 206] [wife was not under disability to maintain action for battery or fraud against husband for infecting her with venereal disease]; *State* v. *Lankford* (1917) 29 Del. 594 [102 A. 63] [man

---

*Reporter's Note: Hearing granted, April 28, 1983 (L.A. 31758).

convicted of battery for fraudulently concealing venereal disease and infecting wife]; see Prosser, *supra,* § 18, p. 105.)

These old cases lend support to allowing the within action, in spite of the language in each case extolling the virtuous character of the woman involved.

We do not assess the wisdom nor predict the future course in the retreat from the double standard of morality for men and women in sexual matters. We do not think, however, at this stage of social mores, that it is relevant to judge appellant's action on the basis of morality.

## IX. *Violation of Fiduciary Obligation*

Appellant and respondent differ markedly in their assessment of the impact of the attorney-client relationship in the case before us. Appellant contends that a fiduciary obligation extends to any type of conduct by which an attorney seeks to benefit at the client's expense. Respondent replies that no legal authority imposes on an attorney the burden of a fiduciary obligation with respect to his or her personal relations with a client. The parties have cited no case directly on point, and we can find none.

It is evident, however, that the lawyer-client relationship affects the proof of appellant's cause of action at trial, rather than the sufficiency of the pleadings. Because of the importance of the issue, we offer the following comments for the guidance of the trial court in further proceedings.

"[F]iduciary" and "confidential" have been used synonymously to describe " '. . . any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he [or she] voluntarily accepts or assumes to accept the confidence, can take no advantage from his [or her] acts relating to the interest of the other party without the latter's knowledge or consent. . . .' " (*Herbert* v. *Lankershim* (1937) 9 Cal.2d 409, 483 [71 P.2d 220]; *Bacon* v. *Soule* (1912) 19 Cal.App. 428, 434 [126 P. 384].) Technically, a fiduciary relationship is a recognized legal relationship such as guardian and ward, trustee and beneficiary, principal and agent, or attorney and client (see Frankel, *Fiduciary Law* (1983) 71 Cal.L.Rev. 795), whereas a "confidential relationship" may be founded on a moral, social, domestic, or merely personal relationship as well as on a legal relationship. (See *Stevens* v. *Marco* (1956) 147 Cal.App.2d 357, 374 [305 P.2d 669]; *Bolander* v. *Thompson* (1943) 57 Cal.App.2d 444, 447

[134 P.2d 924]; *Robbins* v. *Law* (1920) 48 Cal.App. 555, 561 [192 P. 118].) The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party.

■ Our Supreme Court has stated that "[t]he relation between attorney and client is a fiduciary relation of the very highest character, and binds the attorney to most conscientious fidelity . . . ." (*Cox* v. *Delmas* (1893) 99 Cal. 104, 123 [28 P. 687]; see also *Rader* v. *Thrasher* (1962) 57 Cal.2d 244, 250 [18 Cal.Rptr. 736, 368 P.2d 360]; *Sanguinetti* v. *Rossen* (1906) 12 Cal.App. 623, 630 [107 P. 560]; 1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, §§ 47-54, pp. 55-62.) Further, the court has admonished that "[a] member of the State Bar should not under any circumstances attempt to deceive another person, . . ." (*Cutler* v. *State Bar* (1969) 71 Cal.2d 241, 252 [59 Cal.Rptr. 425, 428 P.2d 289]; *McKinney* v. *State Bar* (1964) 62 Cal.2d 194, 196 [41 Cal.Rptr. 665, 397 P.2d 425]; cf. Bus. & Prof. Code, § 6106.) Numerous cases have applied these basic principles where an attorney in breaching the fiduciary obligation has gained financial advantage. (See, e.g., *Cutler* v. *State Bar, supra,* at p. 251; *Gold* v. *Greenwald* (1966) 247 Cal.App.2d 296, 309-310 [55 Cal.Rptr. 660]; *Clark* v. *Millsap* (1926) 197 Cal. 765, 783, 786 [242 P. 918].) We can find no valid reason to restrict these principles to actions involving financial claims of a client and not to apply them to actions in which the client alleges physical damage resulting from a violation of the attorney's fiduciary obligation.

■ Generally, the existence of a confidential relationship is a question of fact for the jury or the trial court. (*Rieger* v. *Rich* (1958) 163 Cal.App.2d 651, 664 [329 P.2d 770]; *Wilson* v. *Sampson* (1949) 91 Cal.App.2d 453, 459 [205 P.2d 753]; *Estate of Llewellyn* (1948) 83 Cal.App.2d 534, 562 [189 P.2d 822, 191 P.2d 419]; *Wilson* v. *Zorb* (1936) 15 Cal.App.2d 526, 532 [59 P.2d 593]; see 7 Witkin, Summary of Cal. Law (8th ed. 1974) Wills and Probate, § 112, p. 5626.) Where a legally recognized fiduciary relationship exists, however, the law infers a confidential relationship, i.e., it becomes a question of law for the court. (*Rader* v. *Thrasher, supra,* 57 Cal.2d 244, 250; *Sime* v. *Malouf* (1949) 95 Cal.App.2d 82, 98 [212 P.2d 946, 213 P.2d 788].) If the fact finder determines that a confidential relationship exists or the court determines as a matter of law that a fiduciary relationship exists, it is presumed that the one in whom trust and confidence is reposed has exerted undue influence. (*Rader* v. *Thrasher, supra,* 57 Cal.2d 244, 250; *Roeder* v. *Roeder* (1953) 118 Cal.App.2d 572, 580 [258 P.2d 581].) Because a presumption is no longer independent evidence, the effect of the presumption of undue influence is to shift the burden of proof to the fiduciary. (Evid. Code, § 600, subd. (a); 1 Witkin, Cal. Procedure,

Attorneys, *supra,* § 51, p. 60.) The undue influence in the case before us is, of course, relevant on the issue of consent in appellant's cause of action for battery and on the issue of justifiable reliance in her cause of action for misrepresentation.

■ Nevertheless, the unique facts in the case before us compel a more cautious approach in imposing on respondent, as *a matter of law,* the highest fiduciary standard in all his relations with appellant, social as well as legal. The existence of a confidential relationship between appellant and respondent is more properly a question of fact for the jury, or court, who can better assess whether the legal relationship was dominant or whether the parties functioned on a more equal basis in their personal relations. Thus, appellant would have the burden of proving the existence of a confidential relationship. If such a relationship were established, respondent would then have the burden of proving that consent was informed and freely given in the battery cause of action, or, in the alternative, that her reliance was unjustified in the misrepresentation cause of action. To hold otherwise would have a chilling and far-reaching effect on any personal relations between an attorney and his or her clients. The possibility of a factual determination of a confidential relationship should be a sufficient warning to monitor the profession in personal or social relations with clients.

We decline to address another issue indirectly raised by appellant—one of first impression in California, at least as far as statutes, cases, and rules are concerned. She asserts that it is a breach of ethics for an attorney, particularly in a family law context, to induce a client to have sexual relations during the course of the representation, and she points out that other professions have imposed discipline on a member for sexual misconduct with a patient. (See, e.g., *Dresser* v. *Board of Medical Quality Assurance* (1982) 130 Cal.App.3d 506 [181 Cal.Rptr. 797]; *Cooper* v. *Board of Medical Examiners* (1975) 49 Cal.App.3d 931 [123 Cal.Rptr. 563].)

We think this question is more properly directed to the State Bar of California, which so far has not publicly addressed the issue.[11]

---

[11]The Board of Governors of the Oregon State Bar in June 1982 issued Legal Ethics Opinion No. 475, advisory only, stating that it is unethical for an attorney to be sexually involved with the client while representing the client in a divorce action, which of course may differ in degree from a postdissolution modification proceeding. The discussion accompanying the opinion is as follows: "DR 5-101(A) requires that a lawyer not accept employment if the exercise of his or her professional judgment on behalf of the client may be affected by his or her own personal interest, except with the consent of the client after full disclosure. DR 5-101(A) and 2-110(B)(2) and (C)(2) also imply a duty to withdraw from employment if circumstances arise whereby the attorney's personal interests may impair his or her ability to continue to exercise independent professional judgment on behalf of the client, unless the client consents to continued representation after full disclosure.

"These rules recognize that to fulfill the lawyer's responsibility of fully and adequately representing the client, it is essential that the lawyer be able to exercise independent profes-

## *Conclusion*

In summary, the facts alleged in appellant's cross-complaint state causes of action for battery and deceit. Her causes of action are not barred by Civil Code section 43.5, nor by the holding in *Stephen K.* v. *Roni L., supra,* 105 Cal.App.3d 640, or the public policy considerations underlying that decision. Although the constitutional right to privacy normally shields sexual relations from judicial scrutiny, it does not do so where the right to privacy is used as a shield from liability at the expense of the other party. No California statute or decision bars appellant's causes of action, and decisions of other states support their viability by analogy.

## *Disposition*

The judgment is reversed. The Municipal Court for the Napa-St. Helena Judicial District, County of Napa, State of California, is ordered to retransfer respondent's action to the Superior Court of the State of California, for the County of Napa, for further proceedings consistent with the views expressed herein.

Feinberg, J., concurred.

**SCOTT, Acting P. J.**—I respectfully dissent. The cause of action appellant attempts to allege falls squarely within the prohibition of Civil Code section 43.5 which provides that "No cause of action arises for . . . [¶] (c) Seduction of a person over the age of legal consent."

---

sional judgment on behalf of the client. Where there is any question about the lawyer's ability to exercise an independent professional judgment, the client must be able to give an informed consent.

"The lawyer representing one spouse in a dissolution proceeding cannot know with certainty whether a reconciliation is possible or is in the best interest of the client, or how the possibility of a reconciliation might be affected by an affair between the lawyer and the client. Nor can the lawyer know with certainty what reaction the client's spouse would have to learning that the lawyer is having an affair during the dissolution proceedings, or how such knowledge might affect the negotiation of property rights and, if children are involved, the right to custody. *See In the Matter of Lehr and Lehr,* 36 Or.App. 23, 583 P.2d 1157 (1978). The potential for prejudice to the client is immense.

"Moreover, the client may be unable to give a voluntary and informed consent to continued representation. The attorney-client relationship is a fiduciary relationship, one of trust. The nature of that fiduciary relationship tends to make the client intellectually and, in many cases, emotionally dependent upon the attorney. If the client becomes involved in a love affair with the attorney, that dependency would only be increased. It would appear impossible for the lawyer to carry on such an affair with the client and maintain an independent judgment about whether the affair might harm the client's interests. *See* DR 7-101(A)(3). Even if the attorney were able to predict the consequences of the affair and explain them to the client, it is doubtful that the client's consent to the attorney's continued representation could ever be deemed truly informed and voluntary. . . ."

The Legislature in abolishing the seduction cause of action in 1939 labeled the antiheart balm statute as "Wrongs not actionable." Clearly the majority's assertion that "for every wrong there is a remedy" doesn't apply in the instant case.

The majority attempts to characterize appellant's cause of action as a battery or an action for deceit. But in fact, appellant was allegedly seduced by respondent's false representation of infertility. The gravamen of appellant's cause of action is the seduction, that is the act of sexual intercourse induced by appellant's false representations. The injury sustained as a result of the alleged seduction was the ectopic pregnancy and damages that flowed therefrom. Clearly if there can be no cause of action for seduction, there can be no damages for the consequences thereof.

In rejecting respondent's contention that appellant's action is barred by Civil Code section 43.5, subdivision (c), the majority argues that this is not a seduction action because "appellant complains not because her virtue was violated . . . but because the sexual act . . . led to an ectopic pregnancy as a result of respondent's misrepresentation." I find no support for the contention that the only damage from a seduction is loss of virtue. Surely a woman can suffer mentally and physically from an unwanted pregnancy whether it results in a live birth or is sooner terminated. All we are talking about is the damage that flows from the seduction.

I agree with the court in *Stephen K.* v. *Roni L.* (1980) 105 Cal.App.3d 640 at pages 644 and 645 [164 Cal.Rptr. 618] where it states: "Despite [the] legalism [of plaintiff's claim], it is nothing more than asking the court to supervise the promises made between two consenting adults as to the circumstances of their private sexual conduct. To do so would encourage unwarranted governmental intrusion into matters affecting the individual's right of privacy." Should we grant appellant here a cause of action, we cannot logically foreclose a cause of action to a woman who carries the child to a live birth, or one who has a miscarriage. The possibilities are limitless. The courts should stay out of the bedroom. I would affirm the judgment.

Respondent's petition for a hearing by the Supreme Court was denied September 29, 1983. Richardson, J., was of the opinion that the petition should be granted.